No. 11-1111 vacated and remanded, and No. 11-1185 affirmed, by published opinion. Judge KING wrote the majority opinion, in which Chief Judge TRAXLER and Judges MOTZ, DUNCAN, KEENAN, WYNN, FLOYD, and THACKER joined. Judge WILKINSON wrote a dissenting *271 opinion. Judge NIEMEYER wrote a dissenting opinion, in which Judges WILKINSON, SHEDD, and AGEE joined.
KING, Circuit Judge:
Invoking the First Amendment, the district court fully and permanently enjoined enforcement of a City of Baltimore Ordinance requiring limited-service pregnancy centers to post disclaimers that they do not provide or make referrals for abortions or certain birth-control services. The injunction emanated from the court’s award of summary judgment to plaintiff Greater Baltimore Center for Pregnancy Concerns, Incorporated, on its claim that the Ordinance is facially invalid under the Free Speech Clause. See O’Brien v. Mayor of Balt, 768 F.Supp.2d 804, 812-17 (D.Md. 2011). Crucially, however, the summary judgment decision was laden with error, in that the court denied the defendants essential discovery and otherwise disregarded basic rules of civil procedure. We therefore vacate the judgment and remand for further proceedings, without comment on how this matter ultimately should be resolved.[1]
I.
A.
The challenged Ordinance — City of Baltimore Ordinance 09-252 — was passed by the City Council on November 23, 2009, and approved by the Mayor on December 4, 2009. See J.A. 25-28.[2] The Ordinance applies to limited-service pregnancy centers, defined as “any person”:
(1) whose primary purpose is to provide pregnancy-related services; and
(2) who:
(I) for a fee or as a free service, provides information about pregnancy-related services; but
(II) does not provide or refer for:
(A) abortions; or
(B) nondirective and comprehensive birth-control services.
Id. at 25-26. Under the Ordinance, “[a] limited-service pregnancy center must provide its clients and potential clients with a disclaimer substantially to the effect that the center does not provide or make referral for abortion or birth-control services.” Id. at 26. The disclaimer is to be given by way of one or more signs that are “written in English and Spanish,” “easily readable,” and “conspicuously posted in the center’s waiting room or other area where individuals await service.” Id.
By an implementing Regulation of the Baltimore City Health Department, nondi- *272 rective and comprehensive birth-control services are defined as “birth-control services which only a licensed healthcare professional may prescribe or provide.” See J.A. 39-40.[3] The Regulation specifies that, if a “center provides or refers for some birth-control services, it may indicate on the disclaimer sign what birth-control services it does provide and/or refer for.” Id. at 40. Additionally, the Regulation authorizes a center to “indicate on the disclaimer sign that the sign is required by Baltimore City ordinance.” Id.
The Ordinance vests enforcement powers in the Baltimore City Health Commissioner, who, upon “learn[ing] that a pregnancy center is in violation of [the Ordinance],” must “issue a written notice ordering the center to correct the violation within 10 days of the notice or within any longer period that the Commissioner specifies in the notice.” J.A. 26. If a center fails to comply with a violation notice, the Commissioner may issue an environmental or a civil citation pursuant to the Baltimore City Code. Id. at 27. The Commissioner may also “pursu[e] any other civil or criminal remedy or enforcement action authorized by law.” Id.
B.
This 42 U.S.C. § 1983 action — challenging the constitutionality of the Ordinance — was initiated in the District of Maryland on March 29, 2010, by the Greater Baltimore Center for Pregnancy Concerns (the “Center”), together with St. Brigid’s Roman Catholic Congregation and then-Archbishop Edwin F. O’Brien. The plaintiffs’ Complaint names as defendants the Mayor and City Council of Baltimore; Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore; and Olivia Farrow, in her official capacity as then-Acting Baltimore City Health Commissioner (collectively, the “City”). Since then, two of the parties have been succeeded: now-Cardinal O’Brien by Archbishop William E. Lori, and Farrow by Baltimore City Health Commissioner Oxiris Barbot.[4]
1.
The Complaint reflects that the Center qualifies under the Ordinance as a limited-service pregnancy center, in that it “has as its primary purpose providing pregnancy-related services and provides information about pregnancy-related services as a free service”; “does not refer for or provide abortions”; and “does not refer for, or provide information regarding birth control, other than natural family planning and abstinence.” Complaint ¶¶ 25-26. The Center offers pregnancy-related services at two locations in Baltimore, including a space owned by St. Brigid’s and the Archbishop. Id. ¶¶ 10, 16-18. According to the Complaint, the plaintiffs share sincerely held religious beliefs that cause them to oppose abortion and certain forms of birth control. Id. ¶¶ 40-41, 43-44. The Complaint alleges that the Ordinance violates the First Amendment rights of free *273 speech, free assembly, and free exercise of religion, plus the Fourteenth Amendment guarantee of equal protection and Maryland’s statutory “conscience clause,” see Md.Code Ann., Health-Gen. § 20-214(a)(l) (providing, inter alia, that “[a] person may not be required to ... refer to any source for[ ] any medical procedure that results in ... termination of pregnancy”). The Ordinance is attached to the Complaint as its sole exhibit.
On June 4, 2010, before the City even had answered the Complaint and when there were four days remaining for it to do so, the plaintiffs filed a motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Specifically, the plaintiffs sought judgment on their free speech, free assembly, and equal protection claims, contending that the Ordinance is unconstitutional on its face and as applied to them. The plaintiffs insisted that the strict scrutiny standard applies and cannot be satisfied, because the Ordinance fosters viewpoint discrimination against what they termed “pro-life pregnancy centers” and unjustifiably compels only those centers to engage in government-mandated speech. The plaintiffs portrayed the Ordinance-mandated sign as ensuring that every conversation at a limited-service pregnancy center begins with the subject of abortion, and conveying the morally offensive message that abortion is available elsewhere and might be considered a good option.
The plaintiffs supported their summary judgment motion with an affidavit of Carol Clews, the Center’s Executive Director, corroborating several of the factual allegations in the Complaint. See J.A. 29-31 (the “Clews Affidavit” of June 3, 2010). The Clews Affidavit asserted that, “[i]f not required by law, the Center would not post the disclaimer compelled by Baltimore City Ordinance 09-252.” Id. at 30. The plaintiffs also proffered an excerpt from the “Journal of the City Council” reflecting that the Council rejected proposed amendments to the Ordinance aimed at expanding its disclosure requirements to, e.g., pregnancy centers that refer for abortions but not adoptions. Id. at 296-99.
On June 8, 2010, the City filed a motion to dismiss the Complaint in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, or alternatively to dismiss the claims of St. Brigid’s and the Archbishop, under Rule 12(b)(1), for lack of standing. The City characterized the Ordinance as a consumer protection regulation, referring to evidence in the Ordinance’s legislative record showing that limited-service pregnancy centers often engage in deceptive advertising to attract women seeking abortion and comprehensive birth-control services, and then use delay tactics to impede the women from accessing those services. According to the City, limited-service pregnancy centers thereby pose a threat to public health, in that the risks and costs of abortion increase as a woman advances through her pregnancy, and that delays in access to the birth control of a woman’s choice can leave the woman vulnerable to unintended pregnancy and sexually transmitted diseases.
The parties’ respective dispositive motions prompted the district court to enter a Scheduling Order specifying deadlines for further related submissions. In compliance with the Scheduling Order, the plaintiffs filed a response to the City’s motion to dismiss on July 2, 2010; the City submitted a reply concerning its dismissal motion, combined with a response to the plaintiffs’ motion for summary judgment, on July 16, 2010; and the plaintiffs filed a reply with respect to their summary judgment motion on July 23, 2010.
*274 2.
a.
The City’s July 16, 2010 submission included four pieces of evidence from the Ordinance’s legislative record that had previously been referenced in the City’s motion to dismiss. The first such piece of evidence was a July 2006 report prepared for Congressman Henry A. Waxman entitled “False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers.” See J.A. 413-30 (the “Waxman Report”). The Waxman Report concerned pro-life pregnancy centers referred to as “pregnancy resource centers,” and it recited, in pertinent part, that
[p]regnancy resource centers often mask their pro-life mission in order to attract “abortion-vulnerable clients.” This can take the form of advertising under “abortion services” in the yellow pages or obscuring the fact that the center does not provide referrals to abortions in the text of an advertisement. Some centers purchase advertising on internet search engines under keywords that include “abortion” or “abortion clinics.” Other advertisements represent that the center will provide pregnant teenagers and women with an understanding of all of their options. For example, “Option Line,” a joint venture of [national umbrella organizations] Heartbeat International and Care Net, is a 24-hour telephone hotline that connects pregnant teenagers and women with pregnancy resource centers in their communities. The main page of Option Line’s website states at the top, “Pregnant? Need Help? You Have Options,” but does not reveal that both Heartbeat International and Care Net represent only pro-life centers or that only non-abortion options will be counseled.
Id. at 417-18 (footnotes omitted). Otherwise, the Waxman Report focused on information that was provided over the telephone by federally funded pregnancy resource centers in fifteen states to investigators posing as pregnant seventeen-year-old girls.
The City’s second piece of evidence from the Ordinance’s legislative history — a January 2008 report of the NARAL Pro-Choice Maryland Fund entitled “The Truth Revealed: Maryland Crisis Pregnancy Center Investigations” — was premised on visits by investigators to “crisis pregnancy centers” or “CPCs” all located in Maryland. See J.A. 326-412 (the “Maryland Report”). The Maryland Report’s findings included the following:
Maryland Crisis Pregnancy Centers attract clients with their advertisements offering free pregnancy tests and “pregnancy options counseling.” This is a very appealing offer for women in a vulnerable time in their lives. After providing free urine pregnancy tests (the kind available at any drug store), women are counseled with only negative information about the option of abortion. They are given wildly inaccurate information about the physical and mental health risks associated with abortion, and informed only about the joys of parenting and adoption. If a client continues to consider abortion, she is given false information about abortion service availability and encouraged to delay her decision. CPCs that offer ultrasounds and [sexually transmitted infection] testing are able to delay clients further through appointment wait times, while also gaining a sense of authority and credibility in their client’s eyes as a medical service provider. However, CPCs are not medical centers. They are operated by volunteers who are, in general, poorly trained in women’s re *275 productive health issues and well trained in anti-choice propaganda.
Id. at 334.
The City’s third and fourth pieces of evidence from the Ordinance’s legislative record consisted of written testimony. Tori McReynolds recounted that, sixteen years earlier, when she was a sixteen-year-old girl who needed to know if she was pregnant, her mother arranged for her to visit a limited-service pregnancy center in central Maryland that “was listed in the phone book under ‘Abortion Counseling.’ ” J.A. 261 (emphasis omitted). McReynolds produced a urine sample for a pregnancy test “and was told that it would take about 45 minutes to know the result.” Id. During the waiting period, a woman at the center subjected McReynolds to anti-abortion propaganda. Id. McReynolds testified: “I felt tricked; I was a frightened teenager expecting a discussion about my options and instead I was bullied by an opinionated adult twice my age.... Had my mother and I seen a sign at that reception desk informing us that we could not get referrals for abortion or birth control, we would have simply moved on.” Id.
Dr. Jodi Kelber-Kaye of the University of Maryland, Baltimore County, testified that, “[a]s an educator of college-aged women,” she had “heard countless stories from students who go [to limited-service pregnancy centers], assuming they will get a full range of services and counseling and wind up feeling harassed, coerced, and misinformed.” J.A. 273. Dr. Kelber-Kaye also said she was “distressed by the existence of centers that, on purpose, appear to be medical facilities and are not staffed by licensed medical personnel, nor even licensed counselors.” Id. “Simply put,” Kelber-Kaye concluded, “there should be truth in advertising and, like all consumer products, limited-service pregnancy centers need to be kept honest about what services they actually provide.” Id.
b.
In addition to discussing the foregoing evidence, the City asserted in its July 16, 2010 submission that the plaintiffs’ summary judgment request was premature, in that the City had not been afforded the opportunity to conduct discovery or to fully develop expert testimony on key factual issues.[5] The City contended that discovery was needed to test the veracity of the plaintiffs’ allegations and to develop evidence tending to refute their claims. Pursuant to former Rule 56(f), the City submitted an affidavit of Special Assistant City Solicitor Stephanie Toti, identifying issues that required discovery. See J.A. 41-43 (the “Rule 56(f) Affidavit” of July 16, 2010); see also Fed.R.Civ.P. 56(f) (2010) (providing that, “[i]f a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may,” inter alia, “deny the motion” or “order a continuance to enable ... discovery to be undertaken”).[6]
The Rule 56(f) Affidavit specified that the City needed “to conduct discovery concerning the advertising that the [plaintiff] Center and other limited-service pregnancy centers employ, [to] demonstrate its *276 deceptive character.” J.A. 42. The Affidavit also deemed discovery necessary “to develop factual support for [the City’s] argument that the services offered by [the Center] are a form of commerce, and, therefore, the disclaimer required by the Ordinance is commercial speech, subject only to rational basis scrutiny — not strict scrutiny.” Id. Additionally, the Affidavit maintained that the City “require[d] the opportunity to develop expert testimony to provide factual support for the propositions that deceptive advertising by limited-service pregnancy centers threatens public health in a variety of ways.” Id. at 41. The Affidavit explained that one potential expert, Dr. Laurie Schwab Zabin, had “agreed to provide [the City] with a declaration detailing the harms that can result from delays in women’s access to abortion or comprehensive birth control services.” Id. at 42. Dr. Zabin had not completed her declaration, however, and was then abroad on vacation. Id.
The Rule 56(f) Affidavit further disclosed that another potential expert, Dr. Robert Blum, had already provided a declaration to the City, which the City in turn included in its July 16, 2010 submission to the district court. See J.A. 44-46 (the “Blum Affidavit” of June 17, 2010). In his Affidavit, Dr. Blum, the Director of the Johns Hopkins University Urban Health Institute, confirmed that “[p]ublic health is advanced when individuals are provided with complete and accurate information about their health care options and the availability of health care services. This is especially true for women who are facing unintended pregnancies or seeking to control their fertility.” Id. at 45. The Blum Affidavit elaborated:
Women seeking family planning services or pregnancy-related care are at a disadvantage relative to service providers in two ways. First, providers possess more information than consumers. Second, providers possess more power than consumers. As a result, full disclosure of what services a provider is offering, as well as what biases underlie the provision of those services, is needed to ensure that consumers are not deceived or taken advantage of; consumers are able to make fully informed, autonomous decisions about family planning or pregnancy-related care; and consumers have timely access to the services they seek.
Id. at 45-46. According to the Blum Affidavit, the Ordinance “serves important public health goals” by “providing] women with key information they need to make decisions about where to go for reproductive health care.” Id. at 45. The City indicated that the Blum Affidavit was representative of evidence it sought to develop during discovery proceedings.
3.
The state of the evidentiary record was discussed during a motions hearing conducted by the district court on August 4, 2010. See J.A. 47-141. The City reiterated its need for discovery to counter the plaintiffs’ summary judgment motion, and it requested the opportunity to submit the Ordinance’s entire legislative record so that the court could “review all of it and not just the portions that” were included in the City’s submission of July 16, 2010. Id. at 127.
For their part, the plaintiffs maintained that no discovery was warranted, in that the district court could apply strict scrutiny and “strike [the Ordinance] down on its face.” J.A. 90. In that regard, the plaintiffs asserted that the court could “very clearly rule as a facial matter,” looking solely to the Ordinance, its legislative history, and the pertinent case law. Id. According to the plaintiffs, the court would need to consider their as-applied challenge only if it rejected their facial challenge, *277 and even then discovery could be circumscribed. See id. at 90-92 (explaining that the breadth of any discovery, including discovery into the plaintiff Center’s operations, “might depend on how wide [the court] feels [the Ordinance is] not facially invalid”).
The district court indicated its agreement with the plaintiffs that discovery was unnecessary for a facial review of the Ordinance. See J.A. 108. The court assured the City, however, that discovery would be authorized before the court engaged in any as-applied analysis. Id. at 130. In the court’s words, “if what [the Center] did is relevant in this case [the City] will have the discovery.... But ... I don’t see where we would advance the ball one way or the other on the facial challenge by knowing what these particular people did.” Id.
Following the motions hearing, the City filed the Ordinance’s entire legislative record, including written opinions provided to the City Council by the City Solicitor and Acting Health Commissioner prior to the Ordinance’s passage vouching for its legality and efficacy. See J.A. 207-08 (October 23, 2009 letter from City Solicitor George A. Nilson advising that, because the Ordinance “merely requires the disclosure of truthful, non-misleading information relevant to a woman’s decision to seek services at a particular location!, it] does not violate the 1st Amendment right to freedom of speech”); id. at 209 (October 21, 2009 memorandum of Acting Health Commissioner Olivia D. Farrow supporting the Ordinance because “[i]t is imperative that all Baltimore City women have the ability to obtain factual and timely advice on all available health care options”). Meanwhile, in response to the district court’s inquiry during the motions hearing about whether the plaintiffs might ever refer for abortion (e.g., in the case of incest), the plaintiffs submitted an official statement of the Catholic Church “affirming] the moral evil of every procured abortion.” Id. at 178. The court thereafter issued its summary judgment decision and permanent injunction without allowing the City any discovery.
C.
1.
By its summary judgment decision of January 28, 2011, the district court determined that, because the City had submitted and relied upon materials beyond the plaintiffs’ Complaint — i.e., the legislative record of the Ordinance — it was appropriate to treat the City’s motion to dismiss as a cross-motion for summary judgment. See O’Brien, 768 F.Supp.2d at 809-10 (citing Fed.R.Civ.P. 12(d) (“If, on a motion under Rule 12(b)(6) ..., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.”)). The court then rebuffed the City’s request for discovery, characterizing it as an improper “attempt to generate justifications for the Ordinance following its enactment.” Id. at 810 (citing United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)). In the court’s view, its duty was to “examine whether the Ordinance, on its face, is subject to, and satisfies, the applicable level of scrutiny”' — an assessment confined to “the evidence relied on by the Baltimore City Council at the time the Ordinance was passed.” Id.
Focusing on the plaintiffs’ free speech claim and turning to the question of the applicable standard for its facial review, the district court rejected the City’s contention that rational basis scrutiny applies because the Ordinance is directed at misleading commercial speech. See O’Brien, 768 F.Supp.2d at 813-14. In doing so, the *278 court looked to the specific characteristics of the plaintiff Center, which the court referred to as the “CENTER.” For example, the court observed that
[t]he overall purpose of the advertisements, services, and information offered by the CENTER is not to propose a commercial transaction, nor is it related to the CENTER’S economic interest. The CENTER engages in speech relating to abortion and birth-control based on strongly held religious and political beliefs rather than commercial interests or profit motives. The notion that human life must be respected and protected absolutely from the moment of conception is a central tenet of the CENTER’S belief system.
Id. at 813 (internal quotation marks omitted). The court deemed it insignificant that “[t]he CENTER offers services that have value in the commercial marketplace,” given that “the offering of free services such as pregnancy tests and sonograms in furtherance of a religious mission fails to equate with engaging in a commercial transaction.” Id. at 813-14 (footnote omitted). Indeed, the court likened the free services provided by the Center with “sacramental wine, communion wafers, prayer beads, [and] other objects with commercial value” offered by churches to their congregants. Id. at 814. Tying the former to commercial speech, the court warned, would “subject [the latter] to diminished constitutional protection.” Id.
In any event, the district court concluded that strict scrutiny would apply even if “the CENTER’S speech includes some commercial elements,” because any commercial speech “ ‘is inextricably intertwined with otherwise fully protected speech.’” O’Brien, 768 F.Supp.2d at 814 (quoting Riley v. Nat’l Fed’n of the Blind of N.C., Inc., 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988)). The court explained that “[t]he dialogue between a limited-service pregnancy center and an expectant mother begins when the client or prospective client enters the waiting room of the center,” and that the presence of an Ordinance-mandated sign (as “a stark and immediate statement about abortion and birth-control”) would alter the course of the center’s communications with its clients and prospective clients. Id. “At the very least,” according to the court, “a disclaimer conspicuous to anyone visiting the CENTER regarding the lack of abortion and birth-control services, mandates the inclusion of a government message concurrent, and intertwined with, [the CENTER’S] delivery of fully protected speech.” Id.
As an additional reason to apply strict scrutiny, the district court declared that the City “enacted the Ordinance out of disagreement with Plaintiffs’ viewpoints on abortion and birth-control,” thereby engaging in “a particularly offensive form of content-based discrimination.” See O’Brien, 768 F.Supp.2d at 814-16 (citing Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (“The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.”)). The court reasoned that, because “the Ordinance is applicable only to those who will never provide or refer for abortion or [certain] birth-control services,” it must have been discriminatorily aimed at “those with strict moral or religious qualms regarding abortion and birth-control.” Id. at 815. Again raising the specific characteristics of the plaintiff Center, the court emphasized that “[t]he CENTER’S viewpoint, formed on the basis of sensitive religious, moral, and political beliefs, is the overarching reason for its stark refusal to perform or *279 refer for abortions and certain types of birth-control.” Id.
Applying strict scrutiny, the district court recognized that the City was obliged to demonstrate that the Ordinance is “ ‘narrowly tailored to promote a compelling [GJovernment interest/ ” O’Brien, 768 F.Supp.2d at 816 (quoting United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)). On the “compelling interest” question, the court noted that the Ordinance’s legislative record was “uneven when demonstrating the depth and severity of the problem relating to limited-service pregnancy centers and deceptive advertising.” Id. Nevertheless, the court “assume[d], for purposes of discussion, that the Ordinance was enacted in response to a compelling governmental interest.” Id. at 817. Such an assumption was appropriate because the court concluded that “the Ordinance falls considerably short of meeting the ‘narrowly tailored’ standard.” Id.
There were two grounds for the district court’s ruling on the narrow tailoring issue. First, “the Ordinance does not provide a ‘carve-out’ provision for those limited-service pregnancy centers which do not engage in any deceptive practices”; rather, “[t]he disclaimer requirement is imposed irrespective of how forthcoming and transparent a pregnancy center presents itself.” O’Brien, 768 F.Supp.2d at 817. Second, “[i]n lieu of the disclaimer mandate of the Ordinance, [the City] could use or modify existing regulations governing fraudulent advertising to combat deceptive advertising practices by limited-service pregnancy centers,” or it “could enact a new content-neutral advertising ordinance applicable to noncommercial entities that directly ameliorate [its] concerns regarding deceptive advertising.” Id.
Having resolved that the Ordinance is not narrowly tailored, the district court summarized “that the Ordinance does not meet the strict scrutiny standard,” and, thus, “Plaintiffs are entitled to summary judgment with regard to their Freedom of Speech claim.” O’Brien, 768 F.Supp.2d at 817.[7] The court entered its permanent injunction three days later, prohibiting “any action to enforce Baltimore City Ordinance 09-252” on the premise that the Ordinance is facially unconstitutional. See O’Brien v. Mayor of Balt., No. 1:10-cv-00760 (D.Md. Jan. 31, 2011), ECF No. 35.
2.
Notably, although it referred throughout its summary judgment decision to the claims and contentions of the “Plaintiffs,” the district court ruled early therein that St. Brigid’s and the Archbishop lack standing to be co-plaintiffs with the Center. See O’Brien, 768 F.Supp.2d at 811-12. Specifically, the court determined that St. Brigid’s and the Archbishop could not make the requisite showing of “the existence of a concrete and particularized injury in fact.” Id. at 811 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (outlining the three elements of standing, including “an injury in fact” that is “concrete and particularized,” as well as “actual or imminent” (internal quotation marks omitted))). The court explained that — because St. Brigid’s and the Archbishop simply allow the Center to use a portion of their facilities free of charge, and do not themselves operate any limited-service *280 pregnancy center — they are not subject to either the requirements or penalties set forth in the Ordinance. Id. Moreover, the court found “speculative, at best, the contention that a sign required by the Ordinance on the CENTER’S wall will be attributed to the landlord.” Id. at 812 (elaborating that “the sign refers to the services provided by the CENTER and would have no reference to the owner of the building in which the CENTER operates”).
Accordingly, the district court granted in part the City’s dismissal motion, dismissing the claims made by St. Brigid’s and the Archbishop for lack of standing. See O’Brien, 768 F.Supp.2d at 812. Nevertheless, the court permitted St. Brigid’s and the Archbishop to participate in the proceedings as amicus curiae and persisted in referring to the “Plaintiffs” collectively. Id.
D.
The parties timely noted these cross-appeals, invoking our jurisdiction under 28 U.S.C. § 1291. As explained below, in the City’s appeal, we vacate the district court’s judgment and remand for further proceedings on the claims asserted by the Center. In the cross-appeal of St. Brigid’s and the Archbishop, we affirm the court’s dismissal of their claims for lack of standing.
II.
The City points to a multitude of flaws in the summary judgment decision, going so far as to contend that we should direct a final judgment in the City’s favor. We refrain today from evaluating the ultimate merits of the Center’s claims, however, focusing instead on the preliminary errors made by the district court as it rushed to summary judgment. Those errors include the court’s denial to the City of essential discovery, its refusal to view in the City’s favor what evidence there is, and its verboten factual findings, many premised on nothing more than its own supposition. In these circumstances, it is fitting to simply vacate and remand for properly conducted proceedings.
A.
Chief among its errors was the district court’s award of summary judgment to the Center without allowing the City any discovery. As a general proposition, “summary judgment is appropriate only after ‘adequate time for discovery.’ ” Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir.1996) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Discovery is usually essential in a contested proceeding prior to summary judgment because “[a] party asserting that a fact ... is genuinely disputed must support the assertion by,” inter alia, “citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials.” Fed.R.Civ.P. 56(c)(1)(A). Obviously, “by its very nature, the summary judgment process presupposes the existence of an adequate record.” Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir.2007). A district court therefore “must refuse summary judgment ‘where the non-moving party has not had the opportunity to discover information that is essential to [its] opposition.’ ” Nader v. Blair, 549 F.3d 953, 961 (4th Cir.2008) (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
We review for abuse of discretion a district court’s denial of discovery prior to ruling on a summary judgment motion. *281 See Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir.1995). “Of course, a district court by definition abuses its discretion when it makes an error of law.” Rice v. Rivera, 617 F.3d 802, 811 (4th Cir.2010) (internal quotation marks omitted). Here, the district court’s rationale for denying the City its right to discovery was patently erroneous.
1.
The City took “the proper course” when it filed the Rule 56(f) Affidavit, “stating that it could not properly oppose ... summary judgment without a chance to conduct discovery.” See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir.2002) (internal quotation marks omitted) (deeming summary judgment award premature where, inter alia, court made its award only six weeks after complaint was filed, before significant discovery). Such a request is “broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.” Raby v. Livingston, 600 F.3d 552, 561 (5th Cir.2010) (internal quotation marks omitted); accord Harrods Ltd., 302 F.3d at 245 n. 18.
It is no justification for the district court’s denial of discovery that the court first converted the City’s motion to dismiss into a cross-motion for summary judgment. There are two requirements for a proper Rule 12(d) conversion. The first is that “all parties be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment”; such notice exists, e.g., “[wjhen a party is aware that material outside the pleadings is before the court.” Gay v. Wall, 761 F.2d 175, 177 (4th Cir.1985) (alterations and internal quotation marks omitted). Here, the court deemed conversion appropriate because the City had submitted and relied upon materials that the court believed to be beyond the plaintiffs’ Complaint — specifically, portions of the legislative record of the Ordinance. The City had alerted the court to precedent, however, that “[f]or purposes of Rule 12(b)(6), the legislative history of an ordinance is not a matter beyond the pleadings but is an adjunct to the ordinance which may be considered by the court as a matter of law.” Anheuser-Busch, Inc. v. Schmoke, 63 F.3d 1305, 1312 (4th Cir.1995), vacated on other grounds, 517 U.S. 1206, 116 S.Ct. 1821, 134 L.Ed.2d 927, readopted with modifications by 101 F.3d 325 (4th Cir.1996).
Even more damaging to the district court’s summary judgment decision, the second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first “be afforded a reasonable opportunity for discovery.” Gay, 761 F.2d at 177 (internal quotation marks omitted); accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 450 (4th Cir.2011) (relying on Gay for conclusion that, because record indicated that parties had not had “opportunity to conduct reasonable discovery,” court would have erred by converting dismissal motion to one for summary judgment). Indeed, Rule 12(d) itself prescribes the same discovery required by our case law. See Fed.R.Civ.P. 12(d) (instructing that, when a Rule 12(b)(6) motion is treated as a summary judgment motion, “[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion”).
2.
Despite the foregoing authorities, the district court denied the City discovery on the theory that, because the Center was pursuing a facial challenge to the Ordi *282 nance, discovery was not warranted. In the First Amendment context, there are two ways for a plaintiff to mount a facial challenge to a statute. First, the plaintiff may demonstrate “that no set of circumstances exists under which [the law] would be valid, or that the [law] lacks any plainly legitimate sweep.” United States v. Stevens, 559 U.S. 460, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010) (citations and internal quotation marks omitted). Second, the plaintiff may show that the law is “over-broad [because] a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” Id. (internal quotation marks omitted). In this case, however, the district court did not fairly examine whether the Ordinance is invalid in all or even a substantial number of its applications. Rather, the district court merely accepted the Center’s description of itself, and then assumed that all limited-service pregnancy centers share the Center’s self-described characteristics.
In effect, by focusing almost exclusively on the Ordinance’s application to the Center, the district court conducted an as-applied analysis, rather than a facial review. But to properly employ an as-applied analysis, the court was obliged to first afford the City discovery. See Richmond Med. Ctr. for Women v. Herring, 570 F.3d 165, 172 (4th Cir.2009) (en banc) (explaining that as-applied challenges, i.e., those “based on a developed factual record and the application of a statute to a specific person,” entail “case-by-case analyses”). The court acknowledged as much during its August 4, 2010 motions hearing, when it recognized that discovery proceedings would be necessary to properly evaluate an as-applied challenge to the Ordinance. See J.A. 130 (promising that “if what [the Center] did is relevant in this case [the City] will have the discovery”); see also id. at 127-28 (explaining that the plaintiffs would not presently be entitled to summary judgment “if I’m concerned about what their individual status is”).
Furthermore, the City was also entitled to discovery as a precursor to any true facial analysis. In the circumstances of the Center’s facial challenge, the district court could not properly evaluate the Ordinance’s validity in all or most of its applications without evidence concerning the distinctive characteristics of Baltimore’s various limited-service pregnancy centers. Cf. Free Speech Coal., Inc. v. Att’y Gen. of the U.S., 677 F.3d 519, 538 (3d Cir.2012) (concluding that the district court erred in dismissing a First Amendment facial claim without the factual record needed to “intelligently weigh the legitimate versus problematic applications of the [challenged statutes]”). Thus, regardless of the type of analysis utilized — facial or as-applied— the court abused its discretion by failing to recognize and honor the City’s right to discovery.
3.
The district court further abused its discretion by restricting its analysis to the legislative record and dismissing the City’s discovery request as a forbidden post-enactment effort to justify the Ordinance. The court relied on the Supreme Court’s decision in United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), for the proposition that the City’s justification cannot be “invented post hoc in response to litigation.” The City, however, sought only to augment the record with evidence to support its existing justification — not to invent a new one. As we have previously observed, “courts have routinely admitted evidence ... to supplement a legislative record or explain the stated interests behind challenged regulations.” 11126 Balt. Blvd. v. Prince George’s Cnty., Md., 886 F.2d 1415, 1425 *283 (4th Cir.1989), vacated on other grounds, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990). Although “ ‘supplemental’ materials cannot sustain regulations where there is no evidence in the pre-enactment legislative record,” id., that simply is not the case here.
B.
In addition to indefensibly denying the City discovery, the district court flouted the well-known and time-tested summary judgment standard. Under that standard, summary judgment is appropriate only if, as Rule 56 is currently written, “the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). It is elementary that, when a court considers a summary judgment motion, “[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505. Moreover, “the judge’s function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.” Id. at 249, 106 S.Ct. 2505; see also Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir.2012) (“The court’s role in deciding a motion for summary judgment is to identify factual issues, not to resolve them.” (emphasis and internal quotation marks omitted)); PHP Healthcare Corp. v. EMSA Ltd. P’ship, 14 F.3d 941, 944 n. 3 (4th Cir.1993) (“By definition, no findings of material facts that were in genuine issue are possible in granting summary judgment.” (internal quotation marks omitted)).
We review an award of summary judgment de novo, guided by the same legal principles that were applicable below. See News & Observer Publ’g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir.2010). Heeding those principles, we conclude that summary judgment was inappropriate on the present record.
1.
The district court’s denial of discovery and failure to adhere to the summary judgment standard marred its assessment of, inter alia, the City’s contention that the Ordinance targets misleading commercial speech and thus is subject to rational basis (rather than strict) scrutiny. While the strict scrutiny standard generally applies to content-based regulations, including compelled speech, see Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641-42, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), less-demanding standards apply where the speech at issue is commercial. Disclosure requirements aimed at misleading commercial speech need only survive rational basis scrutiny, by being “reasonably related to the State’s interest in preventing deception of consumers.” Zauderer v. Office of Disciplinary Counsel of the Supreme Court, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (explaining that, “because disclosure requirements trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech, warnings or disclaimers might be appropriately required in order to dissipate the possibility of consumer confusion or deception” (alterations and internal quotation marks omitted)); accord Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 130 S.Ct. 1324, 1339-40, 176 L.Ed.2d 79 (2010).[8]
*284 a.
Although it may not ultimately prove meritorious, the City’s commercial speech theory should not have been so easily dismissed by the district court. Under that theory, a limited-service pregnancy center
proposes a commercial transaction every time it offers to provide commercially valuable goods and services, such as pregnancy testing, sonograms, or options counseling, to a consumer. Such an offer may take the form of an advertisement in the phone book, on the internet, or on a sign above the [center’s] door. It may also take the form of an oral solicitation from a [center] staff member to a consumer. The City Council received evidence that many [centers] intentionally mislead consumers about the scope of services they offer to obtain the patronage of those seeking abortion and comprehensive birth control services. The Ordinance regulates a [center’s] offer to provide services to consumers by making clear that the offer does not include abortion and comprehensive birth control services.
Reply Br. of Appellants 9-10 (citations omitted).
The threshold question presented is whether the speech regulated by the Ordinance is actually commercial. That analysis is fact-driven, due to the inherent “difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.” See City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 419, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). On one occasion, in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, the Supreme Court defined commercial speech as “expression related solely to the economic interests of the speaker and its audience.” 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). But the Court has noted that commercial speech is “usually defined as speech that does no more than propose a commercial transaction.” United States v. United Foods, Inc., 533 U.S. 405, 409, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001); see also Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 473-74, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (pronouncing “propose a commercial transaction” to be “the test for identifying commercial speech” (emphasis added)). The Court has also described the proposal of a commercial transaction — e.g., “ T will sell you the X prescription drug at the Y price,’ ” Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) — as “the core notion of commercial speech.” Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The City insists that limited-service pregnancy center advertising easily satisfies the “propose a commercial transaction” test. See Br. of Appellants 22 (“When a [center] proposes that a woman patronize its establishment for the purpose of obtaining commercially valuable goods and ser-viees[,] ... it is proposing a commercial transaction.”).
Nevertheless, even where speech “cannot be characterized merely as proposals to engage in commercial transactions,” the speech may yet be deemed commercial; in that event, “proper classification as commercial or noncommercial speech ... presents a closer question.” Bolger, 463 U.S. at 66, 103 S.Ct. 2875; see also Adventure Commc’ns, Inc. v. Ky. Registry of Election *285 Fin., 191 F.3d 429, 440 (4th Cir.1999) (“In the abstract, the definition of commercial speech appears to be fairly straightforward, if somewhat circular: it is speech that proposes a commercial transaction. In practice, however, application of this definition is not always a simple matter.” (citations and internal quotation marks omitted)). From Bolger, courts of appeals have gleaned “three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech.” U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 933 (3d Cir.1990) (citing Bolger, 463 U.S. at 66-67, 103 S.Ct. 2875); accord, e.g., Spirit Airlines, Inc. v. U.S. Dep’t of Transp., 687 F.3d 403, 412 (D.C.Cir.2012); United States v. Benson, 561 F.3d 718, 725 (7th Cir.2009); Adventure Commc’ns, 191 F.3d at 440-41. While “[t]he combination of all these characteristics ... provides strong support for the ... conclusion that [speech is] properly characterized as commercial speech,” Bolger, 463 U.S. at 67, 103 S.Ct. 2875, it is not necessary that each of the characteristics “be present in order for speech to be commercial,” id. at 67 n. 14,103 S.Ct. 2875.
Here, the district court abruptly concluded, “[u]nder both Bolger and Central Hudson,” that “the speech regulated by the Ordinance is not commercial speech.” O’Brien, 768 F.Supp.2d at 813. Focusing on the plaintiff Center, the court reasoned that “[t]he overall purpose of the advertisements, services, and information offered by the CENTER is not to propose a commercial transaction, nor is it related to the CENTER’S economic interest.” Id. Rather, the court determined, “[t]he CENTER engages in speech relating to abortion and birth-control based on strongly held religious and political beliefs rather than commercial interests or profit motives.” Id. (citing official statement of Catholic Church).
Ruling thusly, the district court accepted as fact the Center’s assertion that its motives are entirely religious or political. But that assertion was not at all undisputed. Thus, discovery is needed to substantiate, inter alia, whether the Center possesses economic interests apart from its ideological motivations. Such discovery is “especially important” where, as here, “the relevant facts are exclusively in the control of the [summary judgment movant]” or the “case involves complex factual questions about intent and motive.” See Harrods Ltd., 302 F.3d at 247.[9]
In any event, the potential commercial nature of speech does not hinge solely on whether the Center has an economic motive, as even Bolger does not preclude classification of speech as eom- *286 mercial in the absence of the speaker’s economic motivation. See 463 U.S. at 67 n. 14, 103 S.Ct. 2875. Because the Ordinance compels a disclaimer, the “lodestars in deciding what level of scrutiny to apply ... must be the nature of the speech taken as a whole and the effect of the compelled statement thereon.” Riley v. Nat’l Fed’n of the Blind of N.C., Inc., 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In other words, context matters. From a First Amendment free speech perspective, that context includes the viewpoint of the listener, for “[c]om-mercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information.” See Cent. Hudson, 447 U.S. at 561-62, 100 S.Ct. 2343; see also Va. State Bd. of Pharmacy, 425 U.S. at 756, 96 S.Ct. 1817 (“Freedom of speech presupposes a willing speaker. But where a speaker exists ... the protection afforded is to the communication, to its source and to its recipients both.” (footnote omitted)).
The Supreme Court of North Dakota employed just such an analysis in Fargo Women’s Health Organization, Inc. v. Larson, 381 N.W.2d 176 (N.D.), cert. denied, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986). There, the plaintiffs alleged that the defendant Help Clinic, “through false and deceptive advertising and related activity, misleads persons into believing that abortions are conducted at the clinic with the intent of deceptively luring those persons to the clinic to unwittingly receive anti-abortion propaganda.” Id. at 177. The trial court entered a preliminary injunction barring “all deceptive advertising and related solicitation practices,” and the Help Clinic appealed. Id. Notwithstanding the Help Clime’s assertion “that its communication is not commercial speech because no financial charges are assessed against persons receiving services from the clinic,” the state supreme court deemed the clinic’s advertisements to be commercial speech. Id. at 180-81. The court explained that “the degree, if any, that monies are received by the Help Clinic from its clients [is not] dispositive [of the commercial speech issue].” Id. at 180. It was “[m]ore impor-tante ]” to the court that “the Help Clinic’s advertisements are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas.” Id. at 181. “In effect,” the court concluded, “the Help Clinic’s advertisements constitute promotional advertising of services through which patronage of the clinic is solicited, and in that respect constitute classic examples of commercial speech.” Id.[10]
In contrast to the preliminary injunction at issue in Larson, our review today is of a permanent injunction entered in the absence of a fully developed record. Without all the pertinent evidence — including evidence concerning the Center’s economic motivation (or lack thereof) and the scope and content of its advertisements — we cannot properly analyze the speech regulated by the Ordinance. Cf. Milavetz, 130 S.Ct. at 1344-45 (Thomas, J., concurring in part *287 and concurring in the judgment) (“[B]e-cause no record evidence of Milavetz’s advertisements exists to guide our review, we can only speculate about the ways in which the [disclosure requirement] might be applied to Milavetz’s speech.”). Put succinctly, the district court should have likewise refrained from immediately deciding the commercial speech issue.[11]
b.
The district court’s hasty decision cannot be excused by its ruling that any commercial speech regulated by the Ordinance “ ‘is inextricably intertwined with otherwise fully protected speech,’ ” thus triggering strict scrutiny. See O’Brien, 768 F.Supp.2d at 814 (quoting Riley, 487 U.S. at 796,108 S.Ct. 2667). The Riley decision addressed the constitutionality of North Carolina’s “requirement that professional fundraisers disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity.” 487 U.S. at 795, 108 S.Ct. 2667. Defending that statutory provision, the State argued that it “regulates only commercial speech because it relates only to the professional fundraiser’s profit from the solicited contribution.” Id. The Supreme Court assumed “that such speech in the abstract is indeed merely ‘commercial,’ ” but concluded that the speech loses “its commercial character when it is inextricably intertwined with otherwise fully protected speech,” i.e., the informative and persuasive aspects of the fundraiser’s solicitation. Id. at 796, 108 S.Ct. 2667.
Equating Baltimore’s Ordinance with the statutory requirement at issue in Riley, the district court relied on its own speculative finding that “[t]he dialogue between a limited-service pregnancy center and an expectant mother begins when the client or prospective client enters the waiting room of the center.” See O’Brien, 768 F.Supp.2d at 814. Furthermore, the court prematurely and perhaps inaccurately characterized that disclaimer as “a stark and immediate statement about abortion and birth-control,” i.e., a declaration that abortion and birth control are morally acceptable options. Id.
Significantly, discovery could refute the district court’s factual assumptions. Discovery might also show that any commercial aspects of a limited-service pregnancy center’s speech are not “inextricably intertwined” with its fully protected noncommercial speech. See Hunt v. City of L.A., 638 F.3d 703, 715 (9th Cir.2011) (“[W]here the two components of speech can be easily separated, they are not ‘inextricably in *288 tertwined..’ ” (citing Fox, 492 U.S. at 473-74, 109 S.Ct. 3028 (concluding that commercial speech aspect of “Tupperware parties” was not inextricably intertwined with noncommercial instruction on home economics))). That is, a fully developed record could demonstrate that “[n]othing in the [Ordinance] prevents [a center] from conveying, or the audience from hearing, ... noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.” See Fox, 492 U.S. at 474, 109 S.Ct. 3028. In those circumstances, the rational basis test would be the applicable one.
2.
The district court further erred in precipitately concluding that the Ordinance is an exercise of viewpoint discrimination— the court’s additional basis for applying strict scrutiny. See Sons of Confederate Veterans, Inc. v. Comm’r of the Va. Dep’t of Motor Vehicles, 288 F.3d 610, 616 n. 4 (4th Cir.2002) (“The Supreme Court has indicated that a viewpoint-based restriction of private speech rarely, if ever, will withstand strict scrutiny review.” (citing R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 395-96, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992))). That is, the court merely surmised that the Ordinance must have been discriminatorily aimed at pregnancy centers “with strict moral or religious qualms regarding abortion and birth-control,” premised on its assumption that only those centers would never provide or refer for abortion or birth control. See O’Brien, 768 F.Supp.2d at 815. But see Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 762-63, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (explaining, in declining to apply strict scrutiny to “an injunction that restricts only the speech of antiabortion protestors,” that “the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based”).
The district court failed to view the legislative record in the light most favorable to the City, and thus to credit evidence for summary judgment purposes that the Ordinance was enacted to counteract deceptive advertising and promote public health. Moreover, the court ignored the possibility that there may be limited-service pregnancy centers with no “moral or religious qualms regarding abortion and birth-control,” and who refrain from providing or referring for abortion or birth control for other reasons.
Finally, applying strict scrutiny, the district court erred by determining that the Ordinance is not narrowly tailored because “a less restrictive alternative would serve the [City’s] purpose.” See United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Even if strict scrutiny proves to be the applicable standard, the City must be accorded the opportunity to develop evidence relevant to the compelling governmental interest and narrow tailoring issues, including, inter alia, evidence substantiating the efficacy of the Ordinance in promoting public health, as well as evidence disproving the effectiveness of purported less restrictive alternatives to the Ordinance’s disclaimer. See id. at 816, 120 S.Ct. 1878 (“When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government’s obligation to prove that the alternative will be ineffective to achieve its goals.”).
C.
In sum, under the Federal Rules of Civil Procedure and controlling precedent, it was essential to the City’s opposition to the Center’s summary judgment motion— and to a fair and proper exercise of judicial *289 scrutiny — for the district court to have awaited discovery and heeded the summary judgment standard. Meanwhile, the court could have averted any constitutional injuries that the Ordinance may inflict by preliminarily enjoining its enforcement. See Fed.R.Civ.P. 65; see also, e.g., Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir.2003) (concluding that Newsom was entitled to a preliminary injunction on his First Amendment overbreadth claim, while cautioning that “our holding, like any ruling on a preliminary injunction, does not preclude a different resolution of Newsom’s claims on a more fully developed record”).
The district court in Centro Tepeyac v. Montgomery County, another Maryland pregnancy center-compelled disclosure case, proceeded in just that measured fashion. See 779 F.Supp.2d 456 (D.Md. 2011). Mindful that the record was undeveloped and the County therefore unprepared to show otherwise, the court accepted at the preliminary injunction stage that strict scrutiny applied to the challenged disclosure requirement. See id. at 462-68. Importantly, however, the court did not foreclose the possibility that evidence adduced in future discovery proceedings might render lesser scrutiny appropriate, e.g., if the County’s Resolution were shown to regulate commercial speech. See id. at 463. Employing strict scrutiny to resolve the motion before it, the court preliminarily enjoined one portion of the Resolution’s disclosure requirement (that “the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider”), but not the other (that “the Center does not have a licensed medical professional on staff’). See id. at 469-72. In doing so, the court credited the County’s asserted compelling interest in preserving public health, and deemed “the record ... at least colorable at this stage to suggest that the [nonenjoined portion of the disclosure requirement] is narrowly tailored to meet the interest.” Id. at 471. The court further concluded that the County was unlikely to prove narrow tailoring of the enjoined portion of the disclosure requirement, articulating particular concern that it constituted “unneeded speech,” and also noting several possible less restrictive alternatives. Id. at 468-69 & n. 9, 471.
Today, alongside this opinion, we issue a separate opinion in which we affirm the Centro Tepeyac preliminary injunction decision, concluding that “the district court acted well within its discretion” and “commend[ing] the court for its careful and restrained analysis.” See Centro Tepeyac v. Montgomery Cnty., No. 11-1314(L), 722 F.3d 184, 186, 192, 2013 WL 3336825 (4th Cir. July 3, 2013) (en banc). Our good dissenting colleagues overplay Centro Tepeyac, repeatedly invoking it as the ultimate word on the First Amendment issues presented herein. See, e.g., post at 299 (Niemeyer, J., dissenting) (characterizing our remand of this case for discovery on the commercial speech issue as “curious” in view of our affirmance of “the district court’s conclusion in Centro Tepe-yac that a similar Montgomery County, Maryland provision compelled noncommercial speech”); id. at 306 (asserting that Centro Tepeyac “hold[s]” that the County is not entitled to discovery on the effectiveness of purported less restrictive alternatives); id. at 307 (citing Centro Tepeyac for the proposition that City of Baltimore Ordinance 09-252, “[o]n its face, ... is overbroad and unconstitutional”). The dissenters thereby ignore crucial differences between that case and this one — most significantly, that Centro Tepe-yac involves a mere preliminary injunction decision, rather than a final judgment bes *290 towing permanent injunctive relief on the basis of a summary judgment award.
As the Supreme Court has instructed, where a preliminary injunction is under an interlocutory examination, determining whether the district court abused its discretion “is the extent of our appellate inquiry.” See Doran v. Salem Inn, Inc., 422 U.S. 922, 934, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), followed by Giovani Corandolo, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir.2002) (“We make no prediction as to the outcome at trial but simply hold, as the Supreme Court did [in Doran], that ‘[i]n these circumstances, and in the light of existing case law, we cannot conclude that the District Court abused its discretion by granting preliminary injunctive relief.’ ” (second alteration in original) (quoting Do-ran, 422 U.S. at 934, 95 S.Ct. 2561)). Faithful to the abuse-of-discretion standard, we are obliged to affirm in Centro T&peyac because the district court “applied a correct preliminary injunction standard, made no clearly erroneous findings of material fact, and demonstrated a firm grasp of the legal principles pertinent to the underlying dispute.” See 722 F.3d at 192. Neither the district court’s Centro Tepeyac decision — nor ours in that case — settles the constitutional questions posed; rather, both leave those issues to be decided on a more fully developed record in properly conducted proceedings.
Consistently with Centro Tepeyac, we conclude herein that the district court erred by entering a permanent injunction without allowing discovery or adhering to the applicable summary judgment standard. Despite this prudent, restrained, and — above all — evenhanded ruling, the dissenters accuse us of all manner of improprieties. Most disappointingly, they depict us, on the one hand, as pro-choice zealots who have engaged in “gratuitous shaping of the issues” and “become seduced by [our] own elaboration of abortion policy.” Post at 299 (Niemeyer, J., dissenting); see also post at 296 (Wilkinson, J., dissenting) (“In strongly implying that the Ordinance will survive First Amendment scrutiny, the majority has established a principle that will bite the very hands that feed it. For compelled speech can serve a pro-life agenda for elected officials as well as a pro-choice one.”).
On the other hand, we are reproached for “an amorous affair with litigation,” an “enchantment with extended procedures,” and an “infatuation with discovery,” as well as for “opin[ing] on various points of civil procedure” when we could be discussing “the dangers of state-compelled speech.” Post at 292, 294, 295 (Wilkinson, J., dissenting). The dissenters would wholly exempt the Center from fundamental procedures to which all civil litigants are both subject and entitled. And, though the dissenters candidly acknowledge that “the district court engaged hypothetically from time to time in discussion about the potential relevance of facts,” they unhesitatingly endorse the court’s summary judgment decision. Post at 299 (Niemeyer, J., dissenting). Indeed, the dissenters freely layer their own supposition on the district court’s, admitting of no other conclusion than that the Ordinance should be enjoined against all Baltimore limited-service pregnancy centers for all time.
We, however, are not so dismissive of the Federal Rules of Civil Procedure, which, as the Supreme Court has underscored, “are designed to further the due process of law that the Constitution guarantees.” Nelson v. Adams USA, Inc., 529 U.S. 460, 465, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000). Esteem for our bedrock procedural rules should be expected, rather than ridiculed. And it is particularly ap *291 propriate here, where because of the ready availability of preliminary injunctive relief, there simply is no need to abridge the City’s due process rights in favor of the Center’s free speech guarantee.[12]
Notwithstanding the dissenters’ unfair and overwrought characterization, our ruling today is simply this: the district court improperly denied the City essential discovery and otherwise flouted the Federal Rules of Civil Procedure. Consequently, we vacate the judgment and remand for further proceedings.
III.
Nevertheless, we affirm the district court’s ruling that St. Brigid’s and the Archbishop lack standing to be co-plaintiffs in this action with the Center. See O’Brien, 768 F.Supp.2d at 811-12. We do so having carefully considered the contentions made by St. Brigid’s and the Archbishop in their cross-appeal, and having reviewed the dismissal of their claims de novo. See Benham v. City of Charlotte, N.C., 635 F.3d 129, 134 (4th Cir.2011) (“The issue of standing to sue is a legal question that we assess de novo.”).
*292 IV.
Pursuant to the foregoing, we vacate the district court’s judgment against the City and remand for such other and further proceedings as may be appropriate. We affirm, however, the court’s dismissal of the claims of St. Brigid’s and the Archbishop for lack of standing, leaving only the Center’s claims for resolution on remand.
No. 11-1111 VACATED AND REMANDED
No. 11-1185 AFFIRMED

. To be clear, we vacate and remand in the appeal (No. 11-1111) noted by defendants Mayor and City Council of Baltimore; Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore; and Oxiris Barbot, in her official capacity as Baltimore City Health Commissioner. We affirm, however, in the cross-appeal (No. 11-1185) of St. Brigid’s Roman Catholic Congregation Incorporated and Archbishop William E. Lori, contesting the district court’s ruling that they lack standing to be co-plaintiffs with the Greater Baltimore Center for Pregnancy Concerns. See O’Brien, 768 F.Supp.2d at 811-12. On initial review by a three-judge panel of our Court, the majority affirmed both the district court’s summary judgment decision and its standing ruling. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 683 F.3d 539 (4th Cir.2012). The panel opinion was subsequently vacated, however, with the grant of rehearing en banc. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., No. 11 — 1 111(L), 2012 WL 7855859 (4th Cir. Aug. 15, 2012).

. Citations herein to "J.A. _” refer to the contents of the Joint Appendix filed by the parties in these appeals.

.The Joint Appendix contains the original version of the Regulation, adopted on July 15, 2010, which indicated that nondirective and comprehensive birth-control services "may also include other birth-control services.” J.A. 39. That language was deleted from the Regulation on September 27, 2010, after being deemed problematic in the course of this litigation. Otherwise, there are no substantive differences between the original and superseding versions of the Regulation.

.The plaintiffs consented to dismiss without prejudice their claims against an additional defendant, the Baltimore City Health Department. See O'Brien, 768 F.Supp.2d at 808 n. 5.Meanwhile, the City voluntarily refrained from enforcing the Ordinance prior to the entry of the district court’s judgment.

. In accordance with Federal Rule of Civil Procedure 26(d)(1), the City was constrained to respond to the plaintiffs’ summary judgment motion without the benefit of discovery because the parties had not yet conferred as required by Rule 26(f).

. By amendment that took effect on December 1, 2010, former Rule 56(f) was carried forward into subdivision (d) without substantial change.

. In view of its summary judgment award on the free speech claim, the district court deemed the Complaint’s other claims to be moot and dismissed them without prejudice. See O’Brien, 768 F.Supp.2d at 817-18 (addressing free assembly, free exercise, equal protection, and Maryland conscience clause claims).

. While disclosure requirements aimed at misleading commercial speech are subject to the rational basis test, “restrictions on non-misleading commercial speech regarding lawful activity must withstand intermediate scrutiny — that is, they must ‘directly advanc[e]‘ a substantial governmental interest and be 'n[o] more extensive than is necessary to serve that *284 interest.’ ” Milavetz, 130 S.Ct. at 1339 (alterations in original) (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). Because the City contends that the Ordinance regulates misleading commercial speech, our focus is on the potential applicability of rational basis scrutiny.

. Even though the Center has averred that it does not charge women for its services, inquiring into the Center’s potential profit motives may not be a futile endeavor. We know that nonprofit entities with religious or political motives can engage in commerce. See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 573, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) ("Even though petitioner’s camp does not make a profit, it is unquestionably engaged in commerce, not only as a purchaser, but also as a provider of goods and services.’’ (citations omitted)); Va. Venniculite, Ltd. v. W.R. Grace & Co.-Conn., 156 F.3d 535, 541 (4th Cir.1998) (explaining that nonprofit land preservation organization's acceptance of land donation "was fundamentally commercial”). Furthermore, although outwardly the Center appears to be driven by religious purposes only, certain operational intricacies may prove otherwise. For example, as another court observed in a similar case at the preliminary injunction stage, if the Center were "referring women to pro-life doctors in exchange for 'charitable' contributions, the analysis could change.” See Evergreen Ass'n, Inc. v. City of N.Y., 801 F.Supp.2d 197, 206 n. 5 (S.D.N.Y.2011).

. The Larson decision, though certainly not binding here, illuminates the potential inefficacy of the analogy drawn by the district court between the Center's free services and “sacramental wine, communion wafers, prayer beads, [and] other objects with commercial value” offered by churches to their congregants. See O'Brien, 768 F.Supp.2d at 814. Unlike the latter, the former are alleged by the City to be the subject of advertisements "placed in a commercial context,” "directed at the providing of services rather than toward an exchange of ideas,” and designed to solicit patronage of the Center. See Larson, 381 N.W.2d at 181.

. Although discovery is needed before this matter can be fairly decided, the existing record is not devoid of relevant evidence. For example, the Maryland Report included in the Ordinance’s legislative record contains an online advertisement for Option Line, the "live contact center” co-established by national umbrella organizations Heartbeat International and Care Net that "provides 24/7 assistance to women and girls seeking information about pregnancy resources.” J.A. 381. The advertisement states, inter alia, that Option Line’s "consultants will connect you to nearby pregnancy centers that offer the following services”: "Free pregnancy tests and pregnancy information”; "Abortion and Morning After Pill information, including procedures and risks”; "Medical services, including STD tests, early ultrasounds and pregnancy confirmation”; and "Confidential pregnancy options.” Id. (emphasis omitted). The City characterizes the advertisement as deceptive, because it “does not indicate that the 'medical services' and ‘confidential pregnancy options' offered by the centers exclude abortion and comprehensive birth control services.” Br. of Appellants 8. Additionally, the City connects the advertisement to the plaintiff Center and several other Baltimore limited-service pregnancy centers, in that each is an affiliate of Heartbeat International or Care Net. See J.A. 228, 241.

. It bears noting that the dissenters find it necessary to distort our decision in an effort to refute it. For example, they erroneously say that we ' ‘fail[ ] to recognize that the challenge addressed by the district court was the plaintiffs' facial challenge,” and that we "re-characterize[ ] the proceeding as an as-applied challenge” just so we can "identify questions of fact to support [our] remand.” Post at 298 (Niemeyer, J., dissenting); see also post at 296 (Wilkinson, J., dissenting) (asserting that, in "a tragedy for free expression,” we insist the district court "undertook an as-applied analysis”). In reality, we amply discuss the facial/as-applied distinction, ultimately concluding that "regardless of the type of analysis utilized — facial or as-applied — the court abused its discretion by failing to recognize and honor the City's right to discovery.” Supra Part II.A.2.
The dissenters also incorrectly assert that we "fail[] to recognize the scrutiny applicable to regulations that compel speech,” going so far as to claim that we "do[ ] not even discuss 'compelled speech.' " Post at 298 (Niemeyer, J., dissenting) (citing Turner Broad. Sys., 512 U.S. at 641-42, 114 S.Ct. 2445). But see supra Part II.B.l (explaining that, "[w]hile the strict scrutiny standard generally applies to content-based regulations, including compelled speech, less-demanding standards apply where the speech at issue is commercial” (also citing Turner Broad. Sys., 512 U.S. at 641-42, 114 S.Ct. 2445)). Even so, the dissenters concede that the Ordinance regulates both commercial and noncommercial speech, but surmise that enough noncommercial speech is implicated to render the Ordinance facially unconstitutional. See post at 303-04 (Niemeyer, J., dissenting) (contending that any "commercial motive” of the plaintiff Center is irrelevant, because the Ordinance “reaches beyond this one pregnancy center and imposes the requirement of a disclaimer sign on every speaker — commercial or not— who provides information 'for a fee or as a free service’ ”). But see Stevens, 130 S.Ct. at 1587 (explaining that, to prove overbreadth, a plaintiff may show that “a substantial number of [a statute's] applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep” (internal quotation marks omitted)); Bolger, 463 U.S. at 67 n. 14, 103 S.Ct. 2875 (declining to preclude classification of speech as commercial in absence of speaker’s economic motivation).
Finally, we note that the dissenters also distort the existing record, repeatedly asserting that "the City’s stated interest [is] in prohibiting [limited-service] pregnancy centers, as a health concern, from misrepresenting information about abortions.” Post at 297 (Niemeyer, J., dissenting); see also id. at 300, 303-04, 306, 307. To be sure, the record includes allegations that such centers provide misinformation about abortion (e.g., that it causes breast cancer). The City has clearly and consistently articulated its position, however, that the Ordinance is aimed at the pregnancy center practice of employing deceptive advertising to attract women seeking abortion and comprehensive birth-control services, and then using delay tactics to impede the women from accessing those services. The City has not asserted, as the dissenters claim, that the Ordinance is intended “to remedy misrepresentations being made by these pregnancy centers about abortion.” See id. at 307.