PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PATRICIA MOORE-KING,

          *Plaintiff-Appellant,*

      v.

COUNTY OF CHESTERFIELD, VIRGINIA;
JAMES J. L. STEGMAIER, County
Administrator, County of
Chesterfield; JOSEPH A. HORBAL,
Commissioner of Revenue, County
of Chesterfield, Virginia; THIERRY
G. DUPUIS, Chief of Police, County
of Chesterfield, Virginia,

          *Defendants-Appellees.*

No. 11-2183

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
John A. Gibney, Jr., District Judge.
(3:09-cv-00804-JAG)

Argued: December 4, 2012

Decided: February 26, 2013

Before TRAXLER, Chief Judge, and WILKINSON and
DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Chief Judge Traxler and Judge Wilkinson joined.

**COUNSEL**

**ARGUED:** Roman Paul Storzer, STORZER & GREENE, PLLC, Washington, D.C., for Appellant. David Wayne Robinson, CHESTERFIELD COUNTY ATTORNEY'S OFFICE, Chesterfield, Virginia, for Appellees. **ON BRIEF:** Chandra D. Lantz, HIRSCHLER FLEISCHER, PC, Richmond, Virginia; John G. Stepanovich, STEPANOVICH LAW, PLC, Chesapeake, Virginia, for Appellant. Jeffrey L. Mincks, Stylian P. Parthemos, Julie A. C. Seyfarth, CHESTERFIELD COUNTY ATTORNEY'S OFFICE, Chesterfield, Virginia, for Appellees.

**OPINION**

DUNCAN, Circuit Judge:

Patricia Moore-King ("Moore-King") challenges the application of regulations enacted by the County of Chesterfield, Virginia (the "County") affecting fortune tellers on various grounds. For the reasons that follow, we affirm the district court's grant of summary judgment in favor of the County.

I.

A.

The parties do not dispute the relevant facts. The Chesterfield County Code of Ordinances (the "Code") defines a "fortune teller" as

> any person or establishment engaged in the occupation of occult sciences, including a fortune-teller, palmist, astrologist, numerologist, clairvoyant, craniologist, phrenologist, card reader, spiritual

reader, tea leaf reader, prophet, psychic or advisor or who in any other manner claims or pretends to tell fortunes or claims or pretends to disclose mental faculties of individuals for any form of compensation.

Code § 6-1. Although Moore-King does not identify herself as a fortune teller, she agrees that her spiritual counseling activities fall within the County's fortune teller definition.

The County regulates fortune tellers in four ways, one of which is applicable to all those operating a business in the County, with the others more specific to fortune tellers. First, every person who has a definite place of business in Chesterfield County, including those covered by the fortune teller provision, must acquire a business license. Code § 6-2.

Second, a person seeking a business license to practice as a fortune teller within the County must "apply for and obtain a permit from the chief of police, or his designee." Code § 15-246(a).[1] The permit application must include biographical information about the applicant, fingerprints and a written authorization to allow the chief of police to conduct a background investigation, and the applicant's certification that all information in the application is true. The chief of police is not to issue a permit if his investigation reveals that "the applicant has been convicted within the last ten years . . . of a felony or any other crime materially affecting the applicant's ability to conduct the permitted activity including a crime involving moral turpitude, or has been denied a permit or has had a permit revoked under any [similar] statute or ordinance." Code § 15-246(d). Section 15-246 also includes procedures for the suspension or revocation of a fortune teller permit.

---

[1]Chapter 15 of the Code identifies fortune tellers as one of eleven "regulated occupations and services." Other occupations regulated under the chapter include bondsmen, precious metal dealers, solicitors, taxicab drivers, licensed salvage dealers, demolishers, rebuilders, vehicle removal operators, and pawnbrokers.

Third, the Code imposes a license tax of $300.00 on fortune tellers and fines any person who acts as an unlicensed fortune teller not less than $50.00 and not more than $500.00 for each such offense. Code § 6-44. The Code also imposes an annual business license fee for businesses with more than $10,000 but less than $200,000 in gross receipts. Code § 6-4. No fee applies if a business receives less than $10,000 in gross receipts. *Id.*

Finally, the County regulates fortune tellers through its zoning ordinances. These ordinances allow "occult sciences," which includes fortune telling, as a conditional use within the C-5 General Business District. Being eligible for C-5 also enables fortune tellers who have acquired a conditional use permit to operate in the Agricultural ("A"), General Industrial ("I-2"), and Heavy Industrial ("I-3) zoning districts. The "conditional use" designation is reserved for "those uses which, because of their unique characteristics, cannot be permitted by right in a particular district or districts, without consideration, in each case, of the impact of those uses upon neighboring land and of the public need for the particular use of the particular location." Code § 19-14. Between January 1, 2005 and December 31, 2009, the County's Board of Supervisors approved 115 of the 119 applications for conditional use permits. J.A. 170.

Beginning in late 2008, Patricia Moore-King sought to offer services as a psychic and spiritual counselor in Chesterfield County under the name of "Psychic Sophie." She rented office space in an area zoned as a C-3 Community Business District. Other tenants included clinical psychologists and licensed professional counselors.

Both on her website[2] and in an affidavit submitted to the district court, Moore-King describes her beliefs and identifies

---

[2]Any discussion of Moore-King's website refers to pages of the website placed in the Joint Appendix by the parties.

the broad range of her interests. In her own words: "I am very spiritual in nature, yet I do not follow particular religions or practices, and 'organized' anything's [sic] are not for me. I pretty much go with my inner flow, and that seems to work best." J.A. 123. Moore-King draws inspiration from a diverse array of sources:

> Spirituality, astrology, Reiki, natural healing, meditation, mind-body-soul-spirit-chakra study, metaphysics in general, new age philosophy, psychology, human behavior, quantum physics, ancient history, philosophy, Kabala/Kabbalah, writing, jewelry making, reading (Manly P. Hall, Madame P. Blavatsky, Alice Bailey, and James Hillman are of special appeal), music, music, music!, and creativity in all forms are passions and interests of mine.

*Id.* She further professes a strong belief in the "words and teachings of Jesus . . . which [she] believe[s] are incorporated into tarot cards" and a belief in "the New Age movement," which Moore-King describes as "a decentralized Western spiritual movement that seeks Universal Truth and the attainment of the highest individual potential." J.A. 201. She incorporates these beliefs into the spiritual counseling she provides to her clients.

Spiritual counseling involving a psychic reading is apparently Moore-King's primary practice. This counseling appears to consist largely of her use of tarot cards in conjunction with her client's name and astrological sign—as well as the name and astrological sign of any other person about whom the client wishes to inquire—to attempt to perceive whatever she can on behalf of the client. Clients often bring Moore-King specific inquiries about their businesses, relationships, or other personal matters. She encourages clients to take notes during their sessions in order to remember details of what she has said, and to ask her questions about anything that remains unclear.

## B.

In August 2009, authorities from the County contacted Moore-King and informed her she needed a business license to operate. When Moore-King sought to register with the County's Commissioner of Revenue as a business likely to earn less than $10,000 in annual revenue, she learned that the County classified her as a fortune teller as defined in the County Code. She then received a letter informing her that she owed the County $343.75, consisting of the $300 fortune teller license tax under Code § 6-44 and a penalty and accrued interest for late payment.

Moore-King chose not to pay the license tax but instead to challenge the legality of the County's regulatory scheme. In December 2009, she filed a complaint against the County alleging seven counts under the Constitution and federal statutory law. She asserted violations of her First Amendment rights to free speech and the free exercise of religion; statutory claims under the Religious Land Use and Institutionalized Persons Act (the "RLUIPA"), 42 U.S.C. § 2000cc *et seq.*; and allegations that the County's regulatory treatment of her violated the Equal Protection Clause. The County filed a motion to dismiss, and, following a period of discovery, both the County and Moore-King filed motions for summary judgment.

On September 30, 2011, the district court entered a memorandum opinion and order denying the County's motion to dismiss, denying Moore-King's summary judgment motion, and granting summary judgment in favor of the County. The district court began its analysis of Moore-King's free speech claim by characterizing the County's measures as "de minimis regulation of her business . . . common to all businesses in Virginia and, most likely, in the entire nation." *Moore-King v. County of Chesterfield*, 819 F. Supp. 2d 604, 617 (E.D. Va. 2011). It specifically held that Moore-King's business and speech purporting to predict future events constituted "quin-

tessential deception," *id.* at 618, and was thus not entitled to any First Amendment protection.

The district court also offered two alternative rationales for its disposition of Moore-King's free speech claim. First, it concluded that because "verbiage is the product that [Moore-King] sells," the County justifiably regulated her activities as "commercial speech" subject to lessened First Amendment protection. *Id.* at 619-21. Second, even if Moore-King's activities were not considered commercial speech, the County's regulations passed constitutional muster as valid time, place, and manner restrictions because they properly "balance the need to protect the public from unscrupulous charlatans with the opportunity for fortune tellers to practice their profession." *Id.* at 621.

The district court then addressed Moore-King's remaining arguments. As to Moore-King's free exercise and RLUIPA claims, the district court found that Moore-King followed no particular religion in large part because she "expressly disavows that her beliefs are rooted in any religion." *Id.* at 622. It found further support for its conclusion in the "panoramic potpourri of [her] spiritual and secular interests" and her "fee for service model" approach to counseling. *Id.* at 622-23; *see also id.* at 623 ("Religious experience is not typically thought of as purchased chunks at a time."). Having concluded Moore-King was not engaged in the practice of a religion, the district court granted summary judgment to the County on both Moore-King's constitutional and statutory religion claims. Finally, finding no entity or individual similarly situated to but treated differently from Moore-King, the district court determined that the County's regulation of Moore-King as a fortune teller did not violate the Equal Protection Clause.

Moore-King now appeals.

## II.

Moore-King presses four arguments on appeal. First, she asserts that the County's regulatory scheme violates her First

Amendment right to free speech. Second, she argues that the County has violated her right to the free exercise of her religion, also protected by the First Amendment. Her third contention is similar: that the County has substantially burdened her religious exercise in violation of the RLUIPA. Finally, Moore-King claims that the County's regulatory scheme treats her differently than similarly situated people or entities, and in so doing, violates the Constitution's Equal Protection Clause. The district court considered and rejected each of these arguments. We review its opinion granting summary judgment to the County de novo, *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 421 (4th Cir. 2012), and only affirm "if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to [Moore-King], 'no material facts are disputed and the [County] is entitled to judgment as a matter of law,'" *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)). We begin with Moore-King's free speech claim.

## A.

Moore-King contends the County's regulatory scheme for fortune tellers trenches upon her constitutional right to free expression. The County responds that Moore-King's business involves inherently deceptive speech undeserving of any First Amendment protection. We therefore must decide whether Moore-King's spiritual counseling activities merit protection under the First Amendment's Free Speech Clause, and if so, at what level.

### 1.

The County's argument rests on two premises: (1) fortune telling is inherently deceptive; and (2) inherently deceptive speech warrants no protection under the First Amendment. We examine each in turn.

The County contends that fortune telling constitutes inherently deceptive speech because it involves an attempt to predict the future. Indeed, there is some case law to support this view. *See, e.g.*, *Ballard v. Walker*, 772 F. Supp. 1335, 1341 (E.D.N.Y 1991); *White v. Adams*, 343 S.W.2d 793, 793-94 (Ark. 1961); *Rodgers v. Southland Racing Corp.*, 450 S.W.2d 3, 5 (Ark. 1970); *Mitchell v. City of Birmingham*, 133 So. 13, 14 (Ala. 1931) ("So associated with cheats, frauds, imposition upon the credulous and superstition is such profession [i.e., fortune telling], that its absolute prohibition is generally declared to be within the police power of the state, and municipalities to which such power is delegated.").

As more recent case law appears to recognize, however, fortune telling is not necessarily fraudulent or inherently deceptive simply because it involves predictive speech. *See, e.g.*, *Argello v. City of Lincoln*, 143 F.3d 1152, 1153 (8th Cir. 1998); *Adams v. City of Alexandria*, 878 F. Supp. 2d 685, 690-91 (W.D. La. 2012); *Nefedro v. Montgomery Cnty.*, 996 A.2d 850, 858 (Md. 2010); *Spiritual Psychic Sci. Church of Truth v. City of Azusa*, 703 P.2d 1119, 1126 (Cal. 1985) ("[S]ome persons believe they possess the power to predict what has not yet come to pass. When such persons impart their beliefs to others, they are not acting fraudulently; they are communicating opinions which, however dubious, are unquestionably protected by the Constitution."). If, as the County contended at oral argument, all predictive speech were inherently deceptive, most religious prophesy, financial prognostication, and medical diagnosis would fall outside the scope of constitutional protection. *Cf. Nefedro*, 996 A.2d at 858 (noting that lawyers and journalists may also make statements that turn out not to be true). The reality that much professional intercourse depends on predictions about what the future may bring suggests that categorical branding of fortune telling as unworthy of First Amendment protection for that same reason is untenable.

At any rate, the record does not support the district court's broad conclusion that "[t]he undisputed evidence in this case

is that [Moore-King]'s business is deceptive." *Moore-King*, 819 F. Supp. 2d at 618. Moore-King contends that she does not deceive her clients, and the record reflects no countervailing evidence to suggest that she does. Aspects of her business are clearly identified as for entertainment purposes, and the "Terms/Conditions/Disclaimer" section of her website places a number of qualifications on the spiritual and clairvoyant information she purports to provide. *See* J.A. 151 ("Sophie does not provide a 100% guarantee, as people, perceptions, and decisions, can fluctuate, and circumstances out of everyone's control can happen."). A jury might well decide that Moore-King's activities are fraudulent or deceptive. But at a minimum this question raises a genuine issue of material fact, making it unsuitable for decision on a summary judgment basis.

Moreover, the Supreme Court's recent decision in *United States v. Alvarez*, 132 S. Ct. 2537 (2012), calls into question the second premise of the County's argument: that inherently deceptive speech is without First Amendment protection. "Even when considering some instances of defamation and fraud, moreover, the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment. The statement must be a knowing or reckless falsehood." *Id.* at 2545; *see also id.* at 2557 (Alito, J., dissenting) (noting that the plurality opinion "breaks sharply from a long line of cases recognizing that the right to free speech does not protect false factual statements that inflict real harm and serve no legitimate interest"). Here, the County has not specifically argued that Moore-King's speech is knowingly or recklessly false. Absent such arguments, we cannot agree with the County's position that inherently deceptive speech necessarily lacks First Amendment protection.

The County cannot establish either premise of its argument that fortune telling is inherently deceptive speech outside the scope of the First Amendment. Consequentially, we conclude

that the First Amendment Free Speech Clause affords some degree of protection to Moore-King's activities.

2.

We now turn to the more challenging question of the appropriate level of First Amendment protection accorded Moore-King's counseling activities. The court below focused primarily on the nature of the protected expression. In its first alternative holding, the district court classified Moore-King's psychic and counseling activities as commercial speech, and concluded that the County had justifiably regulated her activities as such. Although the County agrees with this conclusion, on appeal it emphasizes that its regulations can be viewed as reasonable content-neutral time, place, and manner restrictions subject to (and passing muster under) intermediate scrutiny. Moore-King does not challenge application of the time, place, and manner framework, but contends that the County's ordinances regulate her activities on the basis of content and viewpoint, and thus trigger strict scrutiny review which the ordinances cannot survive. Thus, at the outset, we must consider whether commercial speech or the time, place, and manner doctrine supplies the proper analytical framework.

Yet neither of these doctrines is a perfect fit. The parameters of commercial speech, typically defined as that which "does no more than propose a commercial transaction," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (citation and internal punctuation omitted), are difficult to identify outside the realm of advertising, *see, e.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419, (1993) (observing "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category"). Certainly some aspects of Moore-King's speech propose a transaction—she is, after all, running a business—but it seems equally the case that not all of her psychic activities and spiritual counseling practices are commercial in the same sense. Courts considering fortune teller

ordinances have reached no consensus on whether to apply a commercial speech analysis or not. *See, e.g., Argello*, 143 F.3d at 1153 (noting fortune telling for compensation consists of both commercial and noncommercial speech).

Moreover, with one unhelpful exception, we can find no case or set of cases applying the time, place, and manner framework to the regulation of an occupation. The exception involves exotic dancing cases. *See, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991). In those cases, however, the Supreme Court has failed to provide clear guidance on the operation of the content-neutrality analysis within that framework. *See* Daniel A. Farber, *The First Amendment* 27 (3d ed. 2010) ("In the nude dancing cases . . . the Court has been unable to agree on a single standard for defining content neutrality.").

At its core this case "involves a collision between the power of government to license and regulate those who would pursue a profession or vocation and the rights of freedom of speech . . . guaranteed by the First Amendment." *Lowe v. S.E.C.*, 472 U.S. 181, 228 (1985) (White, J., concurring). The Supreme Court has recognized the regulation of occupational speech under the "professional speech" doctrine at least since Justice Jackson's concurrence in *Thomas v. Collins*, 323 U.S. 516 (1945). *See generally* David Halberstam, *Commercial Speech, Professional Speech, and the Constitutional Status of Social Institutions*, 147 U. Pa. L. Rev. 771, 834-44 (1999) (discussing history and development of professional speech doctrine). Considering a Texas law requiring a labor organizer to register with the Secretary of State before soliciting on behalf of his organization, Justice Jackson articulated the justification for the professional speech doctrine:

> The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the

state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system . . . . Very many are the interests which the state may protect against the practice of an occupation, very few are those it may assume to protect against the practice of propagandizing by speech or press.

*Thomas*, 323 U.S. at 545 (Jackson, J., concurring). In describing the relationship between the doctrine of professional speech and protected expression, Justice Jackson observed that a "state may forbid one without its license to practice law as a vocation, but . . . could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views." *Id.* at 544. Similarly, in Justice Jackson's view, the state could prohibit the practice of unlicensed medicine, but could not "make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought." *Id.*

Thus, the relevant inquiry to determine whether to apply the professional speech doctrine is whether the speaker is providing personalized advice in a private setting to a paying client or instead engages in public discussion and commentary. Professional speech analysis applies in the former context—where a speaker "takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances," *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) (quoting *Lowe*, 181 U.S. at 232 (White, J. concurring))—but not in the latter. *See also* Robert C. Post, *Democracy, Expertise, and Academic Freedom* 24 (2012) ("Within public discourse, the First Amendment requires law to respect the autonomy of speakers rather than to protect the targets of speech; outside public discourse, the First Amend-

ment permits the state to control the autonomy of speakers in order to protect the dignity of the targets of speech.").

Under the professional speech doctrine, the government can license and regulate those who would provide services to their clients for compensation without running afoul of the First Amendment. Put differently, "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech." *Lowe*, 181 U.S. at 228 (White, J., concurring). And a state's regulation of a profession raises no First Amendment problem where it amounts to "generally applicable licensing provisions" affecting those who practice the profession. *Id.* at 232; *see also Accountant's Soc'y of Va.*, 860 F.2d at 604 ("A statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as 'any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation.'" (quoting *Underhill Assoc. v. Bradshaw*, 674 F.2d 293, 296 (4th Cir. 1982))). So it is here.

Moore-King's activities fit comfortably within the confines of professional speech analysis. As Moore-King describes and as we have recounted, her psychic activities and spiritual counseling generally involve a personalized reading for a paying client. And as the record makes clear, Moore-King "takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances." *Accountant's Soc'y of Va.*, 860 F.2d at 604 (quotation omitted).

Moreover, the County has enacted a generally applicable licensing and regulatory regime for fortune tellers, that is, for anyone who, like Moore-King, "claims or pretends to disclose mental faculties of individuals for any form of compensation." Code § 6-1. Unlike a number of government entities that have imposed outright bans on fortune tellers, *see Argello*, 143 F.3d at 1152, or bans on those fortune tellers receiving compensation, *see, e.g.*, *Nefedro*, 996 A.2d at 859, the County uni-

formly requires any individual seeking to open a business as a fortune teller to acquire a fortune teller business permit, pay the fortune teller license tax, and secure a conditional use permit in a district zoned C-5, A, I-2, or I-3. Indeed, although the steps may differ, the basic paradigm of regulatory requirements before one can publicly practice a profession also applies to law, medicine, taxi-driving, counseling, and many other occupations.

As the government complies with the professional speech doctrine by enacting and implementing a generally applicable regulatory regime, the fact that such a scheme may vary from profession to profession recedes in constitutional significance. Just as the internal requirements of a profession may differ, so may the government's regulatory response based on the nature of the activity and the need to protect the public. *See* Post, *supra* at 134 n.83 ("The shape and form of constitutional protections extended to professional speech will depend upon the precise constitutional values at stake."). With respect to an occupation such as fortune telling where no accrediting institution like a board of law examiners or medical practitioners exists, a legislature may reasonably determine that additional regulatory requirements are necessary. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 446 (2006) (Breyer, J., dissenting) (noting that where speech "is subject to independent regulation by canons of the profession . . . the government's own interest in forbidding that speech is diminished").

To recognize the variability inherent in occupational regulations is not to afford the government carte blanche in crafting or implementing those regulations. We need not delineate the precise boundaries of permissible occupational regulation under the professional speech doctrine in this case because we hold that the County's regulation of Moore-King's activities falls squarely within the scope of that doctrine. The County's

regulations therefore do not abridge Moore-King's First Amendment freedom of speech.[3]

### B.

Moore-King also argues that the County's regulatory scheme interferes with the free exercise of her religion under the First Amendment and the RLUIPA, which in pertinent part prohibits a government from enacting a land use regulation that imposes a "substantial burden on the religious exercise of a person." 42 U.S.C. § 2000cc(a)(1). The County contends Moore-King's set of beliefs does not constitute a religion, and the district court agreed. So do we.

To determine whether Moore-King's set of beliefs deserves constitutional protection as a religion, we consider whether they are (1) sincerely held and (2) religious in nature under Moore-King's "scheme of things." *United States v. Seeger*, 380 U.S. 163, 185 (1965). Because the parties agree and the record supports the view that Moore-King sincerely holds her beliefs, we focus on the second prong. In so doing, we ask whether her beliefs occupy a place in her life "parallel to that filled by the orthodox belief in God." *Id.* at 166; *Dettmer v. Landon*, 799 F.2d 929, 931 (4th Cir. 1986). Although Moore-

---

[3]Moore-King also challenges the County's fortune teller definition under the Free Speech Clause as overbroad and vague. Neither argument has merit. Her claim that the County's regulatory scheme prohibits a substantial amount of protected speech—and is thus overbroad—fails because the County's regulations do not prohibit any speech at all. To succeed on a vagueness challenge, Moore-King must show either that the regulation "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or that it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). In taking the former path, Moore-King omits in her brief the aspects of the County's fortune teller definition that provide significant insight to a person of ordinary intelligence: that a fortune teller is a person "who in any . . . manner claims or pretends to tell fortunes or claims or pretends to disclose mental faculties of individuals for any form of compensation." Code § 6-1. This definition is not vague.

King's "beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection," *Morrison v. Garraghty*, 239 F.3d 648, 658 (4th Cir. 2001) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981)), they must nonetheless amount to a religious faith as opposed to a way of life, *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).

The Supreme Court's seminal decision in *Yoder* provides guidance on the distinction between a religion and a way of life. Illustrating rather than defining this distinction, the Court observed that although both the Old Order Amish and Henry David Thoreau rejected "contemporary secular values accepted by the majority . . . Thoreau's choice was philosophical and personal rather than religious [and therefore did not] rise to the demands of the Religious Clauses." *Yoder*, 406 U.S. at 216. By contrast, seclusion from modern society for the Amish was "not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Id.* The distinction between a religion and a way life mattered, the Court reasoned, because a "way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation . . . ." *Id.* at 215. Indeed, "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Id.* at 215-16.

Cognizant that defining the borders between the personal and philosophical on one side, and the religious on the other "present[s] a most delicate question," *id.* at 215, we conclude that Moore-King's beliefs more closely resemble personal and philosophical choices consistent with a way of life, not deep religious convictions shared by an organized group deserving of constitutional solicitude. *Yoder* teaches that Moore-King must offer some organizing principle or authority other than herself that prescribes her religious convictions, as to allow otherwise would threaten "the very concept of ordered lib-

erty." Yet Moore-King forswears such a view when she declares that instead of following any particular religion or organized recognized faith, she "pretty much goes with [her] inner flow, and that seems to work best." J.A. 123. That a wide variety of sources—the New Age movement, the teachings of Jesus, natural healing, the study of metaphysics, etc.—inform and shape Moore-King's "inner flow" does not transform her personal philosophical beliefs into a religion anymore than did Thoreau's commitment to Transcendentalism and idealist philosophy render his views religious.

To describe Moore-King's beliefs as a way of life but not a religion is not to belittle them. Indeed, the Supreme Court cautioned in *Yoder* that a "way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." 406 U.S. at 224. That Moore-King draws inspiration from an eclectic range of sources or that she charges her clients for her psychic activities and spiritual counseling neither affects our analysis nor elicits our condemnation. We observe only that she cannot avail herself of the protections afforded those engaged in the practice of religion.

Having determined that Moore-King's beliefs comprise a way of life, and not religious exercise, we agree with the district court's conclusion that granting summary judgment to the County on Moore-King's constitutional and statutory religion claims is proper.

C.

We turn finally to Moore-King's Equal Protection argument. She first contends that the County's regulatory scheme triggers strict scrutiny under the Equal Protection Clause because it classifies her on the basis of her First Amendment rights. But as we have already explained, the County's regulations do not infringe Moore-King's right to free speech or the free exercise of religion. Consequentially, we do not apply

heightened scrutiny when reviewing her Equal Protection challenge. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.").

A zoning or licensing ordinance violates the Equal Protection Clause where the plaintiff can demonstrate "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Consistent with rational basis review, we presume the validity of the County's fortune teller regulations, and, because they concern matters of social and economic policy, we afford the County "wide latitude." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see also Dukes*, 427 U.S. at 303 ("States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude."); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 172 (4th Cir. 2000) ("[C]lassifications in legislation ordinarily will be upheld against an equal protection challenge if 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (citation omitted)). Moore-King argues she was irrationally treated differently from those engaged in "other office uses"; other fortune tellers, like those at church-sponsored fairs or telling fortunes as stage actors; and other "spiritual readers," "prophets," "psychics," or "advisors." The County contends that Moore-King is not in fact similarly situated to any of these entities, and even if she is, any differential treatment is not without a rational basis.

Moore-King's arguments cannot overcome the deferential standard we must accord to the County's regulatory scheme.

Assuming without deciding that Moore-King is situated similarly to the entities she identifies, we nonetheless conclude that she fails to carry her burden of negating "every conceivable basis which might support" the County's zoning and licensing ordinances. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The County may believe it appropriate to impose higher entry costs or more stringent zoning limitations[4] on those seeking to open a business as a fortune teller than on "other office uses" such as financial advisers, party planners, nonprofit organizations, or import-export companies—the examples Moore-King gives—in order to discourage the—in Moore-King's words—"innumerable scam artists"[5] that might otherwise operate as fortune tellers and take advantage of the County's citizens. Likewise, the County could rationally suppose it proper to place greater regulatory burdens on Moore-King's counseling activities than on the licensed counselors and advisers to whom she seeks to compare herself. Granting the County wide latitude to determine how to regulate those who claim or pretend "to disclose mental faculties of individuals for any form of compensation," we cannot say the County's regulatory scheme lacks any rational relationship to a legitimate governmental interest.

### III.

For the reasons discussed, we affirm.

*AFFIRMED*

---

[4]Moore-King notes in her brief that her current office location in a C-3 district contravenes the County's zoning requirement that fortune tellers operate, with a conditional use permit, in a C-5, A, I-2, or I-3 district. Moreover, she cannot directly challenge the C-3 zoning of her current location because she rents and does not own her office space.

[5]On her website, Moore-King notes that "[m]any legitimate psychics have been tainted by innumerable scam artists who con unsuspecting individuals for hundreds if not thousands of dollars . . . ." J.A. 143.