**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2325**

GREATER BALTIMORE CENTER FOR PREGNANCY CONCERNS,
INCORPORATED,
fiel

        Plaintiff - Appellee,

and

ST. BRIGID'S ROMAN CATHOLIC CONGREGATION INCORPORATED;
ARCHBISHOP EDWIN F. O'BRIEN, ARCHBISHOP OF BALTIMORE AND
HIS SUCCESSORS IN OFFICE, A CORPORATION SOLE,

        Plaintiffs,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE; STEPHANIE RAWLINGS-
BLAKE, Mayor of Baltimore, in her Official Capacity; LEANA S. WEN, M.D., in
her official capacity as Baltimore City Health Commissioner,

        Defendants - Appellants,

and

OLIVIA FARROW, Esq., Acting Baltimore City Health Commissioner, in her
official capacity; BALTIMORE CITY HEALTH DEPARTMENT; OXIRIS
BARBOT,

        Defendants,

------------------------------

INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; PUBLIC
HEALTH ADVOCATES; THE INFORMATION SOCIETY PROJECT AT YALE
LAW SCHOOL; NARAL PRO-CHOICE MARYLAND; NARAL PRO-CHOICE

AMERICA; CATHOLICS FOR CHOICE; BALTIMORE ABORTION FUND; DC ABORTION FUND, ("DCAF"); NATIONAL ABORTION FEDERATION; MARYLAND CHAPTER FOR THE NATIONAL ORGANIZATION FOR WOMEN; PLANNED PARENTHOOD OF MARYLAND; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; WHOLE WOMAN'S HEALTH OF BALTIMORE; WOMEN'S LAW CENTER OF MARYLAND, INCORPORATED; THE HONORABLE CHRISTOPHER VAN HOLLEN, JR.; THE HONORABLE ELIJAH CUMMINGS,

   Amici Supporting Appellant,

EBONY HARRIS; ETHAN TAYLOR; LINDA HOLLIDAY; NICOLE HOWARD; DESTINIE JACKSON; JENNERA SMALLS; AMERICAN CENTER FOR LAW AND JUSTICE; NATIONAL AND LOCAL PREGNANCY CARE ORGANIZATIONS; DEMOCRATS FOR LIFE OF AMERICA; INSTITUTIONAL RELIGIOUS FREEDOM ALLIANCE; CHRISTIAN LEGAL SOCIETY; NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; HEARTBEAT INTERNATIONAL; NATIONAL LEGAL FOUNDATION; STATE OF WEST VIRGINIA; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF KANSAS; STATE OF MICHIGAN; STATE OF NEBRASKA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF UTAH; DR. KESTEN C. GREEN; LAW PROFESSORS; ETHICS & RELIGIOUS LIBERTY COMMISSION; INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INCORPORATED; ARCHDIOCESE OF BALTIMORE,

   Amici Supporting Appellee.

――――――――――

Appeal from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge. (1:10-cv-00760-MJG)

――――――――――

Argued: October 24, 2017       Decided: January 5, 2018

――――――――――

Before WILKINSON, DUNCAN, and AGEE, Circuit Judges.

――――――――――

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Agee joined.

――――――――――

**ARGUED:** Suzanne Sangree, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellants. David William Kinkopf, GALLAGHER EVELIUS & JONES LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Molly R. Duane, Autumn C. Katz, Stephanie Toti, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellants. Peter J. Basile, FERGUSON, SHETELICH & BALLEW, PA, Baltimore, Maryland; Steven G. Metzger, Anatoly Smolkin, GALLAGHER EVELIUS & JONES LLP, Baltimore, Maryland; Mark L. Rienzi, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellee. Simona G. Strauss, P. Casey Mathews, Palo Alto, California, Veronica R. Jordan-Davis, SIMPSON THACHER & BARTLETT LLP, New York, New York, for Amicus Public Health Advocates. Douglas W. Baruch, Washington, D.C., Janice Mac Avoy, Jennifer L. Colyer, Andrew B. Cashmore, Leigh G. Rome, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York, for Amicus International Municipal Lawyers Association. Priscilla Joyce Smith, YALE LAW SCHOOL, Brooklyn, New York, for Amicus The Information Society Project at Yale Law School. Kimberly A. Parker, Lesley Fredin, Washington, D.C., Paloma Naderi, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, for Amici NARAL Pro-Choice Maryland, NARAL Pro-Choice America, Baltimore Abortion Fund, Catholics for Choice, DC Abortion Fund, Maryland Chapter for the National Organization for Women, National Abortion Federation, Planned Parenthood of Maryland, Religious Coalition for Reproductive Choice, Whole Woman's Health of Baltimore, Incorporated, Women's Law Center of Maryland, The Honorable Christopher Van Hollen, Jr., and The Honorable Elijah Cummings. Andrea Picciotti-Bayer, THE CATHOLIC ASSOCIATION, McLean, Virginia; Jack Ryan Terziu, Baltimore, Maryland, for Amici Ebony Harris, Ethan Taylor, Linda Holliday, Nicole Howard, Destinie Jackson, and Jennera Smalls. Edward L. White III, Erik M. Zimmerman, Ann Arbor, Michigan, Frances J. Manion, Geoffrey R. Surtees, AMERICAN CENTER FOR LAW AND JUSTICE, New Hope, Kentucky, for Amicus American Center for Law and Justice. Anna F. Paprocki, Deanna M. Wallace, AMERICANS UNITED FOR LIFE, Arlington, Virginia, for Amicus National and Local Pregnancy Care Organizations. Thomas C. Berg, Religious Liberty Appellate Clinic, UNIVERSITY OF ST. THOMAS SCHOOL OF LAW, Minneapolis, Minnesota; Kimberlee Wood Colby, Christian Legal Society, CENTER FOR LAW AND RELIGIOUS FREEDOM, Springfield, Virginia, for Amici Democrats for Life of America, Institutional Religious Freedom Alliance, and Christian Legal Society. Kevin H. Theriot, Elissa M. Graves, Scottsdale, Arizona, David A. Cortman, ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia, for Amici National Institute of Family and Life Advocates and Heartbeat International. Frederick W. Claybrook, Jr., CLAYBROOK LLC, Washington, D.C.; Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, for Amicus National Legal Foundation. Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, Thomas M. Johnson, Jr., Deputy Solicitor General, Erica N. Peterson, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for

Amicus State of West Virginia.  Steven T. Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama.   Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas.  Bill Schuette, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan.  Douglas J. Peterson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska.  Michael DeWine, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio.  Alan Wilson,  Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina.   Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas.  Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah.  Blaine H. Evanson, Daniel Nowicki, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California, for Amicus Dr. Kesten C. Green.  C. Kevin Marshall, David T. Raimer, Catherine Maggio Schmucker, JONES DAY, Washington, D.C., for Amici Law Professors.  Daniel P. Collins, Adam P. Barry, MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Amici Ethics & Religious Liberty Commission, International Society for Krishna Consciousness, Incorporated, and Archdiocese of Baltimore.

———————————

WILKINSON, Circuit Judge:

A Baltimore City ordinance requires pregnancy clinics that do not offer or refer for abortions to disclose that fact through signs posted in their waiting rooms. The district court held that the law, as applied to appellee, the Greater Baltimore Center for Pregnancy Concerns, Inc., violates the First Amendment's Free Speech Clause. We affirm. The City has considerable latitude in regulating public health and deceptive advertising. But Baltimore's chosen means here are too loose a fit with those ends, and in this case compel a politically and religiously motivated group to convey a message fundamentally at odds with its core beliefs and mission.

I.

A.

The Greater Baltimore Center for Pregnancy Concerns is a non-profit Christian organization committed to "providing alternatives to abortion to women who find themselves in the midst of an unplanned pregnancy." J.A. 360. Operating from rent-free space provided by a Catholic Church, the Center provides pregnant women with free services, including counseling, bible study, pregnancy tests, sonograms, and education on child care, life skills, and abstinence. It also provides free prenatal vitamins, diapers, clothing, books, and other assistance. The Center does not charge for its goods or services. In keeping with its religious mission, the Center does not provide or refer for abortions. That fact is clearly stated in a "Commitment of Care" pamphlet available in the Center's waiting room. J.A. 362, 375.

5

The Center advertises its pregnancy-related services, but does not expressly broadcast its religious opposition to abortion in those ads. For example, a 2010 campaign on Baltimore buses touted "FREE Abortion Alternatives," "FREE Confidential Options Counseling," "FREE Pregnancy Tests," and "FREE Services." J.A. 698. A 2013 spread in the local *Penny Saver* advertised, among other things, "Pre-natal development information," "Information about procedures and risks of abortion," "Bible Study," and "Post Abortion Counseling & Education." J.A. 693. The Center is also affiliated with two pro-life umbrella organizations, Care Net and Heartbeat International, which refer women to their affiliates through national call centers and websites.

Concerned that women seeking abortions might be misled into visiting pro-life pregnancy centers and delaying the abortion, the Mayor and City Council of Baltimore enacted Ordinance 09-252 on December 4, 2009. The ordinance requires any "limited-service pregnancy center" to post a disclaimer in its waiting room notifying clients that it "does not provide or make referral for abortion or birth-control services." *See* Balt. City Health Code §§ 3-501 to 3-506 (2010). Under the ordinance, a "limited-service pregnancy center" means any entity "whose primary purpose is to provide pregnancy-related services" and which "provides information about pregnancy-related services," but "does not provide or refer for" abortions or "nondirective and comprehensive" birth control. *Id*. at § 3-501. The required signs must be "conspicuously posted" and "easily readable" in English and Spanish. *Id*. at § 3-502(b).

In the event of a violation, the ordinance authorizes Baltimore City's Health Commissioner to issue a notice directing an offending pregnancy center to correct the

6

violation. *Id*. at § 3-503. Failure to comply is punishable by the issuance of a $150 citation. *Id*. at § 3-506; Balt., Md. City Code Art. I, §§ 40-14, 41-14.

B.

The Center filed suit against the City Council, Mayor Stephanie Rawlings-Blake, and acting Health Commissioner Olivia Farrow in the District of Maryland on March 29, 2010. The suit, brought under 42 U.S.C. § 1983, sought to enjoin enforcement of the ordinance for violating the Center's First Amendment rights to free speech, assembly, and free religious exercise; the Fourteenth Amendment's guarantee of equal protection; and Maryland law's so-called "conscience clause," Md. Code Ann., Health-Gen. § 20-214. The Center filed a motion for partial summary judgment on First Amendment grounds supported by an affidavit from its executive director, and the City responded with a motion to dismiss for failure to state a claim. The City also filed a Rule 56(f) affidavit informing the district court that it believed additional discovery was necessary to resolve the case.

The district court granted summary judgment for the Center. It held that the ordinance violated the Free Speech Clause because it was not narrowly tailored to accomplish a compelling government interest. *O'Brien v. Mayor & City Council of Baltimore*, 768 F. Supp. 2d 804, 808 (D. Md. 2011). A panel of this court affirmed that decision on appeal. *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 683 F.3d 539 (4th Cir. 2012).

Rehearing the case en banc, the court vacated the district court's judgment and remanded for further proceedings. *Greater Baltimore Ctr. for Pregnancy Concerns, Inc.*

7

*v. Mayor & City Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013) (en banc). The court concluded that discovery was needed to determine the Center's economic motivation, the scope and content of its advertisements, the effect of the ordinance, and "evidence substantiating the efficacy of the Ordinance in promoting public health, as well as evidence disproving the effectiveness of purported less restrictive alternatives to the Ordinance's disclaimer." *Id.* at 285-88.

On remand, the parties conducted extensive discovery and filed cross-motions for summary judgment. The City objected to some discovery limitations below, but does not raise that issue on appeal. As it acknowledges, "[t]he evidence that the City was able to gather through discovery is more than sufficient" to decide this case. Appellant Opening Br. 17.

The district court held that the ordinance, as applied to the Center, violated the First Amendment right to freedom of speech. J.A. 1243. First, it concluded "that the Ordinance is a content-based regulation that regulates noncommercial speech, or, at the least, that the Center's commercial and professional speech is intertwined with its noncommercial speech, and [the ordinance] is thus subject to strict scrutiny." J.A. 1256. Second, the district court determined that the record failed to demonstrate that the ordinance furthers a compelling government interest because "there is insufficient evidence to demonstrate that deception actually takes place and that health harms are in fact being caused by delays resulting from deceptive advertising." J.A. 1280. Finally, the court concluded that the ordinance is not narrowly tailored because it applies to

pregnancy centers "regardless of whether they advertise nonfraudulently or do not advertise at all." J.A. 1286.

This appeal followed. We review the grant of a motion for summary judgment de novo. *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 691 (4th Cir. 2009). Summary judgment is appropriate where there is no genuine dispute of material fact and "the moving party is entitled to judgment as a matter of law." *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012).

## II.

We must first consider what level of scrutiny applies to the ordinance.

In general, "[l]aws that compel speakers to utter or distribute speech bearing a particular message are subject to . . . rigorous scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). However, the City contends that a relatively relaxed level of scrutiny applies because the regulation is a routine exercise of the state's police power that targets commercial speech, or alternatively that targets professional speech.

### A.

The ordinance, as applied to the Center, does not regulate commercial speech.

As we explained in our prior en banc decision, "commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Greater Baltimore Ctr.*, 721 F.3d at 284 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). However, because "application of this definition is not always a simple matter," *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 440 (4th Cir. 1999), some speech outside this "core notion" may also be deemed commercial.

9

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983). Courts rely on three factors to identify such commercial speech: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *Greater Baltimore Ctr.*, 721 F.3d at 285 (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990)).

Because of the "difficulty of drawing bright lines that will clearly cabin commercial speech," the inquiry is fact-intensive. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993). It is also one in which "context matters." *Greater Baltimore Ctr.*, 721 F.3d at 286. That is why this court remanded this case for discovery to determine, among other things, "evidence concerning the Center's economic motivation (or lack thereof) and the scope and content of its advertisements." *Id.*

The ordinance, as applied to the Center, does not regulate speech that "propose[s] a commercial transaction." *United Foods*, 533 U.S. at 409. Nothing in the record suggests that the Center proposes any transactions in the waiting room where the disclaimer would appear. Even if pregnancy-related services are discussed there, the Center collects no remuneration of any kind, including referral fees from physicians. A morally and religiously motivated offering of free services cannot be described as a bare "commercial transaction."

The City contends that the ordinance regulates commercial speech because the Center advertises its services, some of which have commercial value in other contexts. But that fact alone does not suffice to transform the Center's ideological and religious advocacy into commercial activity.

10

First, it is not clear that the ordinance directly regulates the Center's "advertisement." *Greater Baltimore Ctr.*, 721 F.3d at 285. The City analogizes this case to *First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043 (N.D. Cal. 2015), *aff'd*, 860 F.3d 1263 (9th Cir. 2017), and *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176 (N.D. 1986), in which courts applied commercial speech doctrine to suits involving allegedly misleading advertisements by pregnancy centers. But both those suits involved laws that directly regulated misleading advertising itself. *See First Resort*, 80 F. Supp. 3d at 1047 (applying an ordinance that "prohibit[ed] the use of false or misleading advertising"); *Larson*, 381 N.W.2d at 177 (applying "the North Dakota false advertising law, Chapter 51–12, N.D.C.C."). While motivated by similar concerns, the ordinance here requires a waiting-room disclosure without any effect on advertising *qua* advertising. Indeed, the Baltimore ordinance applies to pregnancy centers regardless of whether they advertise at all.

Second, the record gives no indication that the Center harbors an "economic motivation." *Greater Baltimore Ctr.*, 721 F.3d at 285. Again, the Center is a non-profit organization whose clearest motivation is not economic but moral, philosophical, and religious. It provides free services and collects no fees. And after extensive discovery, the only evidence the City can muster in support of its contention that the Center is economically motivated is its assertion that the Center's "fundraising efforts . . . depend on its ability to attract clients." Appellant Opening Br. 29. That may or may not be true. But the City's evidence is speculative at best. Without more, the relationship here

11

between clinic patronage and fundraising is too attenuated to amount to "economic motivation."

We do not foreclose the possibility that another facility in different circumstances could engage in commercial speech. But with a "fully developed record" now before us, *Greater Baltimore Ctr.*, 721 F.3d at 286, we agree with the district court. The ordinance, as applied to this Center, does not regulate commercial speech.

B.

Nor does the ordinance, as applied to the Center, regulate professional speech.[1]

"The power of government to regulate the professions is not lost whenever the practice of a profession entails speech." *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring in the judgment). But at the same time, "individuals [do not] simply abandon their First Amendment rights when they commence practicing a profession." *Stuart v. Camnitz*, 774 F.3d 238, 247 (4th Cir. 2014). Thus, "[w]hen the First Amendment rights of a professional are at stake, the stringency of review . . . slides along a continuum from public dialogue on one end to regulation of professional conduct on the other." *Id.* at 248 (internal quotation marks omitted).

Because the state has a strong interest in supervising the ethics and competence of those professions to which it lends its imprimatur, this sliding-scale review applies to

---

[1] Contrary to the Center's arguments, the City did not forfeit this argument by failing to advance a professional speech theory earlier. The professional speech issue was fully briefed, analyzed, and decided on remand to the district court. There is no bar to considering it here.

traditional occupations, such as medicine or accounting, which are subject to comprehensive state licensing, accreditation, or disciplinary schemes. *See e.g.*, *Stuart*, 774 F.3d 238 (doctors); *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602 (4th Cir. 1988) (accountants). More generally, the doctrine may apply where "the speaker is providing personalized advice in a private setting to a paying client." *Moore-King v. Cty. of Chesterfield, Va.*, 708 F.3d 560, 569 (4th Cir. 2013).

The Center fits none of these characteristics of a professional speaker. In Maryland, pregnancy centers are not required to be licensed or otherwise subject to a state regulatory scheme.[2] There is no medical or professional board that certifies the Center's employees, nor any disciplinary panel that regulates their conduct. Although the Center has a volunteer "medical director" who is a licensed physician, she is "very rarely" on site and does not meet directly with clients. J.A. 921. Simply put, no one in the Greater Baltimore Center is practicing a "profession" in the traditional sense contemplated by our First Amendment jurisprudence.

Nor does the Center fit the more general criteria laid out in *Moore-King*. Although the Center "provid[es] personalized advice in a private setting," 708 F.3d at 569, and

---

[2] The lack of a licensing scheme distinguishes this case from a recent Ninth Circuit decision analyzing a California clinic disclosure law under the rubric of professional speech. *See Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823 (9th Cir. 2016), *cert. granted sub nom.*, *Nat'l Inst. of Family & Life Advocates v. Becerra*, No. 16-1140 (U.S. Nov. 13, 2017). In that case, the court applied the professional speech doctrine only to compelled disclosures in clinics licensed by the state. *Id*. at 839. The Ninth Circuit did not reach the question of whether the doctrine applied to disclosures required in unlicensed pregnancy centers like the one at issue here. *Id*. at 843.

13

describes its patrons as "clients," J.A. 827, none of those clients are "paying," 708 F.3d at 569. Again, the Center does not charge for its services. "The mere fact that [a pregnancy center] provides its program participants with the promise of confidentiality does not transform its message into professional speech." *Tepeyac v. Montgomery Cty.*, 5 F. Supp. 3d 745, 761 (D. Md. 2014).

With no record of comprehensive state regulation or paying clients before us, we cannot say that the ordinance regulates professional speech.

## C.

Because the commercial speech and professional speech doctrines are inapplicable in this case, the Baltimore ordinance's compulsion "to utter or distribute speech bearing a particular message" receives heightened scrutiny. *Turner Broad. Sys.*, 512 U.S. at 642. As a result, the ordinance calls for more searching review than the relaxed standards advocated by the City.

The essentially factual nature of the compelled disclaimer does not diminish the need for rigorous review. Because a statement's factuality "does not divorce the speech from its moral or ideological implications," *Stuart*, 774 F.3d at 246, a person's right to refrain from speaking "applies . . . equally to statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).

The compelled speech at issue here raises particularly troubling First Amendment concerns. At bottom, the disclaimer portrays abortion as one among a menu of morally equivalent choices. While that may be the City's view, it is not the Center's. The message

conveyed is antithetical to the very moral, religious, and ideological reasons the Center exists. Its avowed mission is to "provid[e] alternatives to abortion." J.A. 360. Its "pro-life Christian beliefs permeate all that the Center does." J.A. 354. Its staff and volunteers are trained "in encouraging women not to have an abortion." J.A. 366. Of course, this mission gives the Center no license at all to lie to women, and, indeed, there is no such suggestion here. But it does provide some latitude in how to broach a sensitive topic. The Center currently explains its opposition to abortion in its "Commitment of Care" pamphlets. But it does so on its own terms. None of that changes the fact that the ordinance forces the Center to utter in its own waiting room words at odds with its foundational beliefs and with the principles of those who have given their working lives to it.

The classic First Amendment violation has always been thought to involve an outright prohibition by the state of certain speech. *See, e.g.*, *Cohen v. California*, 403 U.S. 15 (1971) (holding that a state may not prosecute someone for wearing a jacket bearing the words "Fuck the Draft"); *Near v. Minnesota*, 283 U.S. 697 (1931) (holding that a state may not exercise a prior restraint on publishing a newspaper). But over time, adjunct First Amendment rights have emerged, which in their own way have become as significant for expressive liberty as the right not to be silenced by a disapproving public entity. One of those adjunct rights is the right to listen. *See Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) (observing that the First Amendment "protects both a speaker's right to communicate information and ideas to a broad audience and the intended recipients' right to receive that information and those ideas"). Another is the

15

right to express oneself through conduct. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (holding that a public school may not, without evidence of substantial disruption, punish students for wearing armbands protesting the Vietnam War). Yet another is the right not to utter political and philosophical beliefs that the state wishes to have said. *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (holding that a public school cannot compel students to perform the pledge of allegiance). These adjunct rights have become crucial to speech freedoms because, without them, states can bend individuals to their own beliefs and use compelled speech as a weapon to run its ideological foes into the ground. Preserving some distance between the state and the message is thus the aim of preventing banned speech and compelled speech alike, and it is what gives the right in this case its fundamental character.

III.

We now consider whether the Baltimore ordinance satisfies heightened scrutiny. "[E]xacting First Amendment scrutiny" requires that compelled disclosures be "narrowly tailored" to achieve a "weighty" government interest. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 798 (1988). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

The City's interests are plainly important. Baltimore's stated goals in enacting the ordinance were to address allegedly deceptive advertising and to prevent health risks that can accompany delays in seeking to end a pregnancy. States must have ample room to regulate deceptions and health risks. Courts have long recognized those sorts of aims as

16

weighty. *See, e.g.*, *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376-77 (4th Cir. 2013) ("promoting disclosure to avoid misleading [consumers]"); *Varandani v. Bowen*, 824 F.2d 307, 311 (4th Cir. 1987) ("assuring safe health care for the public"). Where there is solid evidence of such dangers, courts will not hesitate to give government the deference it is due.

However, as the district court found, "there is insufficient evidence to demonstrate that deception actually takes place and that health harms are in fact being caused by delays resulting from deceptive advertising." J.A. 1280. The City's only support for its contention that women might have read a bus ad mentioning "abortion *alternatives*" to mean "abortion *services*" is a reported increase in phone calls to the Center's hotline from "abortion minded callers." J.A. 705. After seven years of litigation and a 1,295-page record before us, the City does not identify a single example of a woman who entered the Greater Baltimore Center's waiting room under the misimpression that she could obtain an abortion there. What the record does show is affirmative advocacy of abortion alternatives by a lawful non-profit group. None of the public advocacy of alternatives, however, suggests that the Center would provide help or assistance in obtaining an abortion. Truthful affirmative assertions are not, without more, misleading.

Additionally, scrutiny of means creates difficulties with the City's view. It is scrutiny of means that helps identify the point on the spectrum where valid disclosures slip silently into the realm of impermissible compelled speech. Particularly troubling in this regard is (1) that the ordinance applies solely to speakers who talk about pregnancy-related services but not to speakers on any other topic; and (2) that the ordinance compels

17

speech from pro-life pregnancy centers, but not other pregnancy clinics that offer or refer for abortion. It is well established that "[t]he government may not regulate . . . based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992). A speech edict aimed directly at those pregnancy clinics that do not provide or refer for abortions is neither viewpoint nor content neutral. Especially in this context, content-based regulation "raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). We do not begrudge the City its viewpoint. But neither may the City disfavor only those who disagree.

Further, there are serious questions here as to narrow tailoring. First, we are unpersuaded that the City could not pursue its goals through less restrictive means. As the Supreme Court has noted in compelled speech cases, the government itself may "communicate the desired information to the public without burdening a speaker with unwanted speech." *Riley*, 487 U.S. at 800. In this case, that would mean informing citizens about the scope of services offered at various facilities through a public advertising campaign. *See Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233, 250 (2d Cir. 2014) (noting that "the City can communicate this message through an advertising campaign"); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190 (4th Cir. 2013) (en banc) (stating that the government had "several options less restrictive than compelled speech," such as "launch[ing] a public awareness campaign" (internal quotation marks omitted)). The City could also pursue its goals through the direct application of laws

18

against misleading advertising. *See First Resort*, 80 F. Supp. 3d at 1047; *Larson*, 381 N.W.2d at 177; *cf. Riley*, 487 U.S. at 800 ("Alternatively, the State may vigorously enforce its antifraud laws . . . .").

Second, and more fundamentally, there is only a loose fit between the compelled disclosure at issue and the purported ills identified by the government. "[W]hen [laws] affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 805 (2011). Baltimore seeks to combat deceptive advertising and consequent delays in abortion services. In that respect the ordinance is quite overinclusive. It applies to pregnancy centers without regard to whether their advertising is misleading, or indeed whether they advertise at all. As illustrated by *Larson* and *First Resort*, the direct application of laws prohibiting misleading advertising might provide a better fit for the problems about which the City is concerned. *See First Resort,* 80 F. Supp. 3d 1043; *Larson*, 381 N.W.2d 176.

There are, in short, too many problems with the City's case. The dangers of compelled speech in an area as ideologically sensitive and spiritually fraught as this one require that the government not overplay its hand. Without proving the inefficacy of less restrictive alternatives, providing concrete evidence of deception, or more precisely

targeting its regulation, the City cannot prevail. The Baltimore ordinance, as applied to the Center, fails to satisfy heightened First Amendment scrutiny.[3]

## IV.

The abortion debate in our country has a long and bitter history. Vast disagreement on the merits has led both sides to retributive speech restrictions and compulsions. *See, e.g., Stuart*, 774 F.3d at 242. To be sure, states must have room for reasonable regulation. But there is a limit to how much they can dictate core beliefs. This court has in the past struck down attempts to compel speech from abortion providers. *Id.* And today we do the same with regard to compelling speech from abortion foes. We do so in belief that earnest advocates on all sides of this issue should not be forced by the state into a corner and required essentially to renounce and forswear what they have come as a matter of deepest conviction to believe.

Weaponizing the means of government against ideological foes risks a grave violation of one of our nation's dearest principles: "that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of

---

[3] Our holding does not conflict with the Ninth Circuit's decision in *Harris*. *See* 839 F.3d 823, *cert. granted*, No. 16-1140 (U.S. Nov. 13, 2017). The law at issue in that case involved two compelled disclosures. First, the law in *Harris* required licensed clinics to post a notice informing women of the availability of state-sponsored services, including abortion, and a phone number to call for more information. *Id.* at 830. The content of that disclaimer—and, because it only applied to licensed facilities, the scrutiny which it received—was markedly different from the Baltimore ordinance. Second, the law in *Harris* required unlicensed pregnancy centers to post a notice stating that their facilities are not licensed by the state. *Id.* Because the compelled message did not mention abortion, the burden on the speaker—and therefore the First Amendment analysis—was different in kind.

20

opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. It may be too much to hope that despite their disagreement, pro-choice and pro-life advocates can respect each other's dedication and principle. But, at least in this case, as in *Stuart*, it is not too much to ask that they lay down the arms of compelled speech and wield only the tools of persuasion. The First Amendment requires it.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.